(Nos. 35836, 35853.—

WILLIAM GUNDICH, Appellant, *vs.* EMERSON-COMSTOCK Co., Appellee.

*Opinion filed Dec. 1, 1960.—Rehearing denied Jan. 18, 1961.*

118

J. W. Horwitz, and Matthew Steinberg, both of Chicago, (William C. Wines, Bradley D. Steinberg, and Sidney Z. Karasik, of counsel,) for appellant.

Andrew J. Farrell, of Chicago, for appellee.

Mr. Justice Bristow delivered the opinion of the court:

The circuit court of Cook County entered judgment on a jury verdict awarding plaintiff, William Gundich, damages of $60,000 for personal injuries sustained as a result of an alleged violation of the Scaffold Act by defendant, Emerson-Comstock Co. On defendant's appeal the Appellate Court entered judgment for defendant notwithstanding the verdict, (24 Ill. App. 2d 138,) and we have granted plaintiff leave to appeal.

This cause presents essentially the issues of whether there was any evidence tending to show that the operator of the crane involved here was defendant's employee, and whether his conduct constituted a violation of certain provisions of the Scaffold Act for which defendant could be held liable.

From the testimony it appears that on June 13, 1956, plaintiff, William Gundich, was employed by Gust Newberg Co., a general contractor, as a member of a five-man crew of ironworkers engaged in the construction of the Ford Stamping Plant in Chicago Heights, Illinois. The crew had detached seven steel beams from the structure

and arranged them in a frame for removal by the crane to another part of the structure. The frame consisted of 3 fifteen-foot beams, known as intermediates, which extended from east to west, and 4 thirty-foot beams, known as stringers, which were placed on top of these intermediates and extended from north to south. The two inner stringers were bolted to the underlying intermediates and the outer stringers were loose.

At approximately 11:45 A.M., William Brown, the operator of the crane, was signalled by employees of the Newberg company to lower the small hook of the crane and move this steel to the west part of the structure. A choker, or cable with an eye loop, was attached by the ironworkers to the center of the southernmost intermediate; another choker was attached to the center of the northernmost intermediate; and the opposite ends of both chokers were attached to the small hook lowered by the crane.

According to the testimony of Brown and members of the crew of ironworkers, the load was lifted and lowered either three or four times, in response to signals given by Edwin Sak, one of the ironworkers employed by Gust Newberg Co., because the load was off balance. After each attempt, the ironworkers apparently adjusted the chokers and the beams. On apparently the fourth lift, when the load was upward between one and two feet, a member of the crew saw that the load was still not centered, and the witness Sak again signalled that the load be lowered. The operator of the crane, however, continued to lift it and veered the load to the west. There was testimony that it was jerked, causing the frame to shift, and the beam on the east end to roll off. This resulted in the load tipping to the west, so that the loose beam on the west end fell and knocked plaintiff, who apparently was standing close by on one of the girders, into the hole. Plaintiff sustained serious injuries which are not controverted on this appeal.

The evidence indicates further that the crane was owned

by the Ford Motor Company and operated by William Brown, who had been on the payroll of defendant Emerson-Comstock Co. since March 25, 1956, according to the testimony of defendant's accountant. Brown, who testified for defendant, stated that he was hired and employed by the defendant company as an electrician, and that in connection with the construction of the Ford Stamping Plant, he operated a crane most of the time. He testified to his years of experience in operating cranes, described generally how the crane operates, and stated that he alone had control of the crane and operated it in response to arm and hand signals given by employees of Gust Newberg Co. In this connection there were variations in the testimony of Brown and the ironworkers as to just what the signals were for the movements of "up," "easy up," and "down," although the witness Sak stated that they had a system of signals that both he and the crane operator understood, and that everything would be fine if the crane operated according to his signal.

Brown also testified that his "immediate supervisor," who kept a record of his time on the project, was a little French fellow whom he presumed also worked for the defendant company. It later appeared from the testimony of this "immediate supervisor" that he was employed by J. Livingston & Co., another electric company also engaged on the construction project.

The record further shows that defendant made certain offers of proof relating to Brown's employment status, which the trial court held incompetent and barred from the jury. That evidence included a written joint-venture agreement between some four electrical contractors, including defendant Emerson-Comstock Co., pertaining to the work on this construction project. Under its terms, each of the electrical contractors was responsible for hiring and paying its employees, and the "joint venture" reimbursed defendant for Brown's wages as a crane operator. The

general contractor, Gust Newberg Co., was not a party to that agreement. Defendant also offered proof that the "joint venture" billed Gust Newberg Co. for the crane operations, and proof relating to the union rule that crane operators had to be hired by the electrical contractors or hoisting engineers, and that these groups had to divide or alternate the work.

Plaintiff originally brought suit against the Emerson-Comstock Co., J. Livingston & Co., and Ford Motor Co. The trial court directed a verdict in favor of J. Livingston & Co. at the close of plaintiff's case, and the jury returned a not guilty verdict for the Ford Motor Co., but awarded plaintiff damages of $60,000 against defendant Emerson-Comstock Co. Defendant made no motion for a new trial, but submitted only a motion for judgment notwithstanding the verdict, which the trial court denied. The Appellate Court, however, entered judgment for defendant notwithstanding the verdict on the ground that Brown, the crane operator, was, as a matter of law, a loaned servant of the Newberg company, plaintiff's employer, rather than an employee of defendant, and, therefore, there was no basis for imposing liability upon defendant under the Scaffold Act.

Plaintiff asserts that the evidence establishes that defendant Emerson-Comstock Co., through the crane operations of its servant Brown, violated sections 60 and 67 of the Structural Work Act, commonly referred to as the Scaffold Act (Ill. Rev. Stat. 1955, chap. 48, pars. 60, 67). Defendant, however, insists that Brown, at the time of the occurrence, was an employee of plaintiff's employer, Gust Newberg Co., under the loaned servant doctrine, and that there is no evidence that defendant or Brown wilfully violated any of the terms of the act.

We are of the opinion that the Appellate Court was in error in holding that as a matter of law the plaintiff was not an employee of Emerson-Comstock Co. at the time of

his alleged injury. In determining first whether there is any evidence that Brown, the operator of the crane, was defendant's servant, we recognize that the criteria reiterated in the Illinois case law for the existence of the master-servant relationship is the right to control, which includes the power of discharge. (*Harding* v. *St. Louis Nat. Stock Yards,* 242 Ill. 444; *Densby* v. *Bartlett,* 318 Ill. 616; *Connolly* v. *People's Gas Light and Coke Co.* 260 Ill. 162; *Forest Preserve Dist.* v. *Industrial Com.* 357 Ill. 389.) We also recognize that where an employee is sent by his general employer to another for the performance of special work, the test whether he becomes the employee of the person to whom he is sent depends upon whether he becomes wholly subject to that person's control and freed during such time from the direction and control of his master. (*Merlo* v. *Public Service Co. of Northern Illinois,* 381 Ill. 300.) This presents a question of fact for the jury, which must weigh such factors as the matter of hiring, the mode of payment, the right to discharge, and the manner of direction of the services. *Merlo* v. *Public Service Co. of Northern Illinois,* 381 Ill. 300.

This court considered this question fully in *Merlo* v. *Public Service Co.,* where the operative facts were quite analogous to the instant case. There the Porter company contracted with the village of Maywood to furnish a steel crane and operator for use in digging trenches for sewers being installed by the village. The Porter company selected and paid the crane operator, as did defendant Emerson-Comstock Co. in the instant case, and was reimbursed by the village, just as defendant was reimbursed by the joint venture; and the employees of the village directed the crane operator where to dig, just as the ironworkers herein signalled Brown to lift and lower the various loads. In the *Merlo case* two of the village's servants hired through the W.P.A. were electrocuted when the crane operator allowed the boom to strike an electric line. In an action for the

wrongful death of these employees, the jury returned a verdict for plaintiffs against the Porter company. This court refused to set aside that verdict, and rejected defendant's contention that the evidence established that the crane operator was a loaned employee of the village.

The *Merlo case* was cited and followed on this issue in *Murphy* v. *Lindahl,* 24 Ill. App. 2d 461, decided by another division of our Appellate Court some eighteen days after the instant case was adjudicated in the court below. The *Murphy case* involved a common-law action by a city employee for injuries sustained as a result of being struck by the bucket of a trench digging machine owned by defendant Lindahl, and operated by the engineer Coffman. The latter was hired by Lindahl through the union, and sent to work for the city pursuant to a leasing agreement between Lindahl and the city. Coffman received his orders and direction from the city employees as to where and how wide to dig. In denying liability, defendant Lindahl argued, as did defendant in the case at bar, that Coffman was the loaned servant of the city, and was a fellow employee of plaintiff. In affirming a judgment entered on the jury verdict imposing damages against Lindahl, the Appellate Court stated tht even though the city had the right to demand that the operator be replaced, it had no right to discharge him and no control over him in the actual operation of the machine. Consequently, the court held that the question whether the operator was a loaned servant was for the jury, and its verdict would not be set aside.

The reasoning in the *Murphy* and *Merlo* cases is in accord with that of the United States Supreme Court in *Standard Oil Co.* v. *Anderson,* 212 U.S. 215, 53 L.ed. 480, cited by both plaintiff and defendant herein. The court in that case considered whether a winchman who operated the loading apparatus on a ship was the servant of the stevedores whose work was being done, and whose employees gave him signals for hoisting and lowering the cases of oil,

or of his general employer, the defendant Standard Oil Co. In affirming a judgment for plaintiff against the general employer, the court stressed the facts that the winchman was hired and paid by the defendant, who alone had the right to discharge him. With respect to the significance of the fact that he was directed in the loading operation by the stevedores, the court stated at p. 226: "Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and co-ordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, *and is not enough to show that there has been a change of masters.*" (Ital. ours.) In the light of this reasoning and the factors emphasized by the court, it is not clear to us just how the *Standard Oil case* can be regarded as an authority for defendant in our case.

Defendant also relies upon *Allen-Garcia Co.* v. *Industrial Com.* 334 Ill. 390, in support of its contention that Brown was a loaned employee of the Newberg company as a matter of law. In that case an operator and a crane were loaned by Swift & Co. to a coal mine to be used by an engineering company in doing certain work at the coal mine. The operator was paid by Swift & Co., which was reimbursed by the coal company; and the operator received directions from the superintendent of the engineering company and his assistant. In determining workmen's compensation liability, the Industrial Commission found that the operator was the employee of the special employer. That decision was upheld by the circuit court and by this court, which stated at p. 398: "The conclusion and determination of the Industrial Commission on a question of

fact will not be disturbed unless against the manifest weight of the evidence, *regardless of the conclusion this court might reach were it to hear the evidence.* [Citation.] The finding that defendant in error was an employee of plaintiff in error at the time of the accidental injury is not manifestly against the weight of the evidence." (Ital. ours.) An accurate reading of that opinion indicates that this court did not determine that the employee therein was a loaned servant as a matter of law, as defendant and the Appellate Court assert. On the contrary, the clause "regardless of the conclusion this court might reach were it to hear the evidence," indicates that the court regarded the question as to who the employer was at the time of the accidental injury as a question of fact, on which it would not disturb the findings of the commission, as triers of fact, irrespective of whether it agreed with that body.

This interpretation of the *ratio decidendi* of the *Allen-Garcia case* is further evident from the court's reliance on the excerpt from Emack's Case, 232 Mass. 596, 123 N.E. 86, which it quoted at pp. 395-6: " 'But the Industrial Accident Board was called upon to decide a question of fact, and it might well have found that even if Emack was temporarily in the employment of the Holbrook, Cabot & Rollins Corporation, in the care and operation of the crane, he remained the employee of the Aberthaw Company. * * * remained the employee of the general employer. We cannot say that this finding was wrong. The question was one of fact, there was evidence to support the finding, and we cannot set it aside.' "

Our interpretation of the *Allen-Garcia case,* moreover, is by no means novel. It has been followed by our court (*Fransen Construction Co.* v. *Industrial Com.* 384 Ill. 616; *Forest Preserve Dist.* v. *Industrial Com.,* 357 Ill. 389; *Meyer* v. *Industrial Com.* 347 Ill. 172), and advocated by legal scholars (Vol. I, Angerstein, *Illinois Workmen's Compensation,* p. 58, Supplement (1958), p. 26).

Viewed in this light, the *Allen-Garcia case* is in reality an authority for plaintiff herein, since the jury, (rather than the Industrial Commission) as the trier of fact, found that Brown was an employee of the defendant, Emerson-Comstock Co. Moreover, from our review of the record there is ample evidence to support that finding, since Brown was hired, paid and subject to discharge only by defendant. Neither the fact that he responded to signals given by the employees of the Newberg company in lifting and lowering the loads, nor the fact that defendant was reimbursed for wages paid crane operators by the joint venture, which eventually billed the Newberg company, as revealed in the excluded evidence, would *per se* convert Brown into an employee of the Newberg company (*Standard Oil Co.* v. *Anderson,* 212 U.S. 215; *Murphy* v. *Lindahl,* 24 Ill. App. 2d 461.) Those were merely factors which the jury was obliged to weigh in determining the ultimate question of fact as to whether Brown was defendant's employee. (*Merlo* v. *Public Service Co. of Northern Illinois,* 381 Ill. 300.) It was error for the Appellate Court to set aside the jury's finding and to hold that Brown was a loaned servant as a matter of law.

We have indicated that the trial court rejected offers of proof on this issue made by the defendant. The Appellate Court found that such evidence was improperly excluded, and treated it as though it had been admitted, on the authority of language in two Appellate Court cases. (*Belorodker Loan & Investment Co.* v. *Goldenberg,* 253 Ill. App. 416; and *Gustin* v. *Bryden,* 205 Ill. App. 204.) The court apparently overlooked the case of *Dayton Scale Co.* v. *General Market House Co.* 335 Ill. 342, decided by this court the same year as the *Belorodker case,* in which it was held that reversing without remanding on the basis of evidence improperly excluded by the trial court was error. The court in the *Dayton Scale Co. case* stated at p. 345: "The evidence on which the Appellate Court based its judg-

ment was not properly before that court and no opportunity had been given to the parties to introduce any and all evidence they might have on the point in dispute."

The Appellate Court also failed to realize that its determination of the ultimate facts in a jury case, particularly from evidence not even submitted to the jury, would be an infringement of the jury function. (*Mirich* v. *Forschner Contracting Co.* 312 Ill. 343.) Moreover, the issue of the propriety of the admission or rejection of evidence is properly considered on a motion for a new trial, and not on a motion for judgment notwithstanding the verdict, which was involved herein. *Millikin Nat. Bank* v. *Shellabarger Grain Products Co.* 389 Ill. 196, 200.

Before liability can be imposed upon defendant, however, it must be established that defendant, either through its servant Brown or otherwise, violated the terms of the Scaffold Act (Ill. Rev. Stat. 1955, chap. 48, pars. 60-69,) and that such violation was "wilful."

Upon the second issue, as to whether the evidence tended to establish a wilful violation of the Scaffold Act, the jury could have found that Brown's conduct amounted to a "wilful violation" of the act. However, since the question is one of law and involves no issue of "manifest weight of the evidence," no motion for a new trial having been made, we may and do decide this question without remanding this case to the Appellate Court for further consideration from the evidence that the plaintiff's misfortune was the result of the following conditions, acts and omissions:

In operating the crane, Brown acted in what he deemed to be a response to manual signals given to him by employees of the Newburg company, the plaintiff's employer.

According to one witness, the signal for "easy up" was "twisting fingers around on the right hand in a circle." According to another witness, the signal for "up" was "right

hand in air, fingers pointed up and turning." This same witness also described the signal for "up" as "hands" (not right hand, as he had previously said,) "in upward motion."

According to another witness, the signal for "up" was "pointing one finger up." He added, "You can put your whole hand up if you want to—it all depends—different trades have different ways." But Brown himself, who operated the crane, understood the signal for "up" to be when a worker "just lifted the right hand up above his shoulder." The witnesses similarly contradicted each other and occasionally themselves on their several understandings of the signal for "down." One witness said that the signal for "down" was "hands out, palms down, flag-like wave of hands downward." Another witness described the signal for "down" as "wrist down, fingers down, making a circle."

But according to Brown, the signal for "down" was "touch right elbow with left hand, and rotary motion of hand with fingers down."

A witness testified, "We had a system of signals that we both understood. Everything would be fine if their crane operator operated according to my signals." Since "everything was not fine," the plaintiff having been seriously injured as a result of Brown's failure to operate the crane in accordance with the intention of the signals that were given him, the jury could reasonably find that there was not that "complete and adequate system of communication by means of signals" that is required by section 7a of the act. Ill. Rev. Stat. 1959, chap. 48, par. 67.

The term "wilfully" in the Scaffold Act has been construed by this court to be synonymous with "knowingly," and it is not necessary that there be a reckless or wanton disregard of the provisions of the act in order to constitute an actionable violation thereof. *Kennerly* v. *Shell Oil Co.* 13 Ill.2d 431, 434.

There was evidence from which the jury could find that

Brown knew or certainly should have known of both the inadequacy of the signals and the likelihood of loose beams falling from the crane. Similarly, defendant Emerson-Comstock Co. knew that a crane was being used by its employee, and it cannot escape the duty imposed by the statute by "closing its eyes" to the way in which the crane was being operated and to the system of signals used by its employee. (*Buckley* v. *Beinhauer,* 121 N.Y.S. 180, affirmed 201 N.Y. 572; *Kennerly* v. *Shell Oil Co.* 13 Ill.2d 431.) Nor is it any defense to defendant that plaintiff or his co-workers may have been concurrently at fault in the loading of the loose beams. *Schultz* v. *Henry Ericsson Co.* 264 Ill. 156.

Wholly apart from the evidence summarized above from which the jury could find that the signals habitually used by Brown and those directing his motions was not the "complete and adequate system of communication by means of signals" required by the act, there was abundant evidence from which the jury could find a violation of section 1 of the act (Ill. Rev. Stat. 1959, chap. 48, par. 60) that "cranes" shall be so "operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be deposited thereon."

The evidence showed that, with Brown's knowedge and participation, as the defendant knew or could and should have known either from Brown or from any of its employees who supervised or should have supervised Brown's actions, there had been a long continued practice of hoisting steel beams that were loaded loosely and in imbalance. It was or should have been obvious that the practice was dangerous. The jury could have found that the plaintiff was injured as a result of this hazardous practice, which had been indulged many times during a period of more than two months before the occurrence.

Therefore there was evidence from which the jury could

reasonably have found a violation of section 7a of the act, or of section 1 of the act, or of both of such sections.

The judgment of the Appellate Court is reversed. The judgment of the circuit court of Cook County is affirmed.

*Appellate Court reversed; circuit court affirmed.*