**James Lavery, Plaintiff-Appellant, v. Ridgeway House, Inc., a Corporation, et al., Defendants-Appellees.**

Gen. No. 53,002.

First District, Fourth Division.

December 3, 1969.

176

Rosenbaum & Rosenbaum, of Chicago (Irvin Tischer, of counsel), for appellant.

John F. O'Meara, Thomas W. Dempsey, of Lord, Bissell & Brook, of Chicago, and William H. Symmes, John M. O'Connor, Jr., of Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago, for appellees.

MR. JUSTICE STAMOS delivered the opinion of the court.

Plaintiff brought an action under the Structural Work Act (Ill Rev Stats, c 48, §§ 60–69 (1961)) commonly referred to as the Scaffold Act, against Ridgeway House, Inc., the owner, Sidney Shapiro, the architect, and Lundsberg Company, a cement contractor. At the close of plaintiff's case, the court directed a verdict in favor of all defendants. Plaintiff appeals.

Plaintiff contends that the court erred in directing a verdict, because plaintiff established that he was under the provisions of the Act at the time he incurred his injuries, that defendants had notice of the violation of the Act, and that the defendants were in charge of the work.

Defendants contend that the court properly directed a verdict because plaintiff had failed to prove the foregoing and also failed to prove that there was a violation of the Act that was the proximate cause of plaintiff's injury.

EVIDENCE

BEN COPPLE, called as an adverse witness under section 60 testified as follows:

He is Chairman of the Board of Directors of the Ridgeway House, Inc., and in 1962 the Ridgeway House was going to build a two-story hospital at 522 Ridgeway Avenue in Chicago. Mr. Shapiro, an architect, was retained to prepare and submit plans for the structure. Shapiro had no duties other than to draw up plans and specifications and see that the contractors were employed. Copple testified that he believed there was a contract entered into between Ridgeway and Shapiro, but he did not sign it nor did he bring a copy of the contract to court. Nor did he have any knowledge as to the terms regarding the hiring of contractors, their

number or identity. The witness testified that it was not until he took the stand that he learned from plaintiff's counsel that Shapiro hired contractors.

The hospital was constructed to accommodate 100 beds, consisting of two stories with a basement. He met with Shapiro occasionally at the office or for lunch before and after the construction was completed. The witness took no part in the construction work, it was not his function. His function was to sign documents in the event the president of the Board was absent and the witness' real function commenced after the hospital was in operation. He and Shapiro never discussed what was going on at the construction site; that Shapiro was engaged in working on the building as an architect. He did not know what Shapiro did in the construction of the building, except make plans for which Shapiro was paid.

SIDNEY SHAPIRO, called as an adverse witness under
section 60 testified as follows:

He is an architect engineer and was employed by Ridgeway Company to prepare plans and specifications. He ordered a survey of the property and prepared sketches and plans and had discussions with the officers of Ridgeway. There was no contract drawn up so that the people that owned the property never signed any document. He was employed to prepare the plans, solicit bids and when he received the bids he submitted them to an officer of Ridgeway who presented them to the Board of Directors of Ridgeway for their approval or disapproval. Ridgeway made its contracts with each individual contractor. He was on the site everyday to see that the contractors followed the intent of the plans and specifications. His duties were to draw the plans, seeing that the contract was let and that the contractors followed the plans and specifications.

179

He was present at the site every morning, five days a week at 8:00 a. m. and spent 2 to 3 hours coordinating the work of the various trades in getting the job completed. He checked the progress of the work and if he determined that a concrete or mason was needed, he would telephone and advise when the workmen were to appear. There were at least 25 trades and contractors.

He was on the site on the day of the accident and observed that two workers from Lundsberg Company were also present. There was someone in charge of the work Lundsberg Company was doing at the site, the witness supposed it was the two men sent out by Lundsberg Company to do cement work on the roof of the structure.

He had called the office of Lundsberg Company a few days before the accident and advised them to be ready to pour cement. When he arrived at the site on the morning of the accident he observed the two cement men from the Lundsberg Company working. He was aware that the Franvimen Company had furnished and installed the hoist at the site, but did not believe he ever inspected it. The hoist was at the site from the middle of April when it became necessary to hoist material to the second floor. The witness was not at the site when the accident occurred and he never examined the pulley and cable at the top of the hoist to see if it was closed. The hoist was used to haul brick and to haul their masonry materials. As far as the witness knew, Franvimen was the only one who used the hoist until the day of the accident. He never saw any personnel using the hoist for transportation.

The witness testified he was trying to recollect if the Lundsberg Company had obtained permission from the Franvimen Company to use the hoist on the day of the accident. He believes there was some conversation between two men on the job on the morning of the accident but did not know. He further related that there

180

probably was a key to open and close the hoist, but did not know. The key belonged to Franvimen Company and its personnel had the key, but he understood that the Lundsberg people operated the hoist on the day of the accident and that they received permission to use the hoist.

STUART BROUN, called as a witness on behalf of plaintiff testified as follows:

He is a cement mason and on the day of the accident was employed by the Lundsberg Company and was at the site pouring cement. He saw plaintiff at the site but never instructed the plaintiff where to put the cement or what to do with it, in fact, the witness did not recall having any conversation with plaintiff regarding the cement. The witness was engaged in getting the cement up to the top of the structure then onto a penthouse roof where two laborers were working in finishing the cement. He was in charge of the job of putting the roof on the penthouse and was working for Lundsberg Company.

JAMES LAVERY, plaintiff, testified on his own behalf as follows:

He is employed as a truck driver and on the date of the accident was engaged as such for the P. B. Cartage Company. He was driving a ready mix concrete truck and delivered two loads of cement to the construction site. On the first delivery he arrived at the site and someone from the Lundsberg Company directed him to the rear of the building to a hoist. The foreman of the Lundsberg Company was giving orders and told plaintiff to back the truck close to the hoist. A wheelbarrow was placed on the hoist platform and the plaintiff, upon direction of a laborer for the Lundsberg Company, would pour cement into the barrow until it was loaded. He did not see any person on the hoist when

181

he backed his truck up, but in between the loading of wheelbarrows he observed a mason contractor once accompany a wheelbarrow of cement up the hoist. He would stand on a platform on the back of his truck using levers to control the flow of cement. After delivering his load of cement in this manner, he received a receipt from a laborer and left a copy with him for the Lundsberg Company. Lundsberg's foreman told plaintiff how much cement was needed for the next load and he called his company on the truck radio and advised them.

He drove off and returned shortly with another load of cement and being unable to see anyone on the construction site, yelled out and also blew the truck horn. When he still did not receive a response, he dismounted from his truck and went over and got on the hoist and rode it to the top. He observed that the hoist operated with a rope pull that starts the hoist to the top. He pulled the rope and stood in the center of the platform which was about four by six feet in size. As the hoist rose, he noticed it began to shake a little with a sideways movement and he placed his hand out a little way to get more balance. Just as the hoist reached the top and while he had his hand up, he felt something. At this moment he was at the top and the hoist had stopped. He saw a laborer from Lundsberg Company come toward him and plaintiff advised him that he had arrived with another truck load of cement. This was the same laborer he observed when he delivered his first load of cement that day. He then observed his injured fingers. The foreman of the Lundsberg Company whom he had also seen earlier in the day, took the witness down on the hoist and drove him to the hospital.

He incurred an injury when his hand got caught between a hoist cable and pulley at the top of the hoist.

He said he must have reached too far out when he tried to balance himself. He did not see a cover or enclosure over the pulley. He had never ridden this hoist at any other time. The witness said the hoist was of a portable type which can be hauled from building to building and erected. It was a material hoist and the witness further related that he could tell what a material hoist is. He said that a material hoist is open as opposed to a passenger hoist and a material hoist is not caged in. No one ever told plaintiff to use the hoist and he never saw the architect, Mr. Shapiro.

When he arrived with the first load, he noticed the hoist motor was in operation, but did not notice any lock on it. When he arrived with the second load of cement, he did not see anyone at the site, but noticed the motor of the hoist was running. He had been around construction sites for 20 years and knows that there are two or three types of hoists. A material hoist is open as opposed to a passenger hoist. It is just a platform about 30″ or 2½ feet wide or so, the hoist he rode at the site was 30 to 40″ wide and was an open platform. A passenger hoist would be closed and used for an entirely different purpose. One is for workmen who are working on the job to take them to where they are going and the other is just for vertical movement of material. The plaintiff also related his injuries, expenses and damages.

OPINION

 The correctness of the trial court's directing the verdict must be measured by the rule enunciated in Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967), that a verdict should be directed when all of the evidence, viewed in its aspect most favorable to the opponent, overwhelmingly favors the moving party.

The first issue to be resolved is whether plaintiff was under the provisions of the Scaffold Act at the time he incurred his injuries.

Section 60 of the Act reads:

"All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any *person or persons employed or engaged thereon, or passing under or by the same,* and in such manner as to prevent the falling of any material that may be used or deposited thereon. . . ." (Emphasis supplied.)

It is noted that the title of the Act states:

"An Act providing for the protection and safety of *persons in and about* the construction, repairing, alteration, or removal of buildings, bridges, viaducts and other structures, and to provide for the enforcement thereof." (Emphasis supplied.)

The statutory purpose of the Act, as interpreted in Schultz v. Ericsson Co., 264 Ill 156, 106 NE 236 (1914) at page 164 was "to prevent injuries to persons employed in this dangerous and extrahazardous occupation, so that negligence on their part in the manner of doing their work might not prove fatal."

Plaintiff's presence at the site was in compliance with his employer's direction and at the request of the cement contractor, and thus, he was rightfully upon the site of the construction as an invitee.

184

However, plaintiff's duties in delivering cement did not necessitate his use of the hoist. When he was ready to make his second delivery, no one was present and instead of waiting for someone to respond to his announced arrival, he rode the "material hoist" to advise the recipients of his readiness to deliver the cement.

Plaintiff cites Halverson v. Campbell Soup Co., 374 F2d 810 (1967) in support of his contention that he is within the Act. It is noted that the litigation concerned indemnification and not the Scaffold Act. In that case Halverson was a construction laborer for Wolfes-Jensen Co., and he suffered his injuries after he delivered a truck load of tools and equipment for use in the construction work being done by Wolfes-Jensen Co. in the Campbell Soup Company plant. Halverson incurred his injuries while on the fourth floor of the building after he was struck by a forklift truck operated by a Campbell Soup Company employee. In Halverson, however, it was incumbent upon him in pursuance of his employment to deliver the equipment and tools to the fourth floor which was the place of his employer's work.

Plaintiff also relies upon Yankey v. Oscar Bohlin & Son, Inc., 37 Ill App2d 457, 186 NE2d 57 (1962). In Yankey, plaintiff there was also a truck driver making a delivery of a load of joists and he was injured when the boom of a hoist fell across his truck. No issue was raised in that case as to whether the driver was entitled to the protection of the Act, but the issues were whether the operator of the defective hoist was a loaned servant and who was in charge of the hoist.

The Act covers any "person or persons employed or engaged thereon, or passing under same." The plaintiff in the case at bar was not "passing under" the hoist nor was he "employed or engaged thereon," at the time he incurred his injury. Therefore, plaintiff did not establish any right under the provisions of the Scaffold Act.

Another issue to be resolved is whether defendants wilfully violated the Scaffold Act.

There can be no liability under the Act without evidence that the Act was violated and that such violation was "wilful." Gundich v. Emerson-Comstock Co., 21 Ill2d 117, 128, 171 NE2d 60 (1960).

It is undisputed that the hoist was what is defined in the industry as a "material hoist." The plaintiff's own testimony established that there are distinct differences between a hoist erected for the transportation of personnel and a hoist for material or supplies. There is no evidence that the material hoist was not "erected and constructed, in a safe, suitable and proper manner." Nor was there any evidence that the hoist was not "erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon. . . ."

In Vykruta v. Thomas Hoist Co. Inc., 75 Ill App2d 291, 221 NE2d 99 (1966), the plaintiff was also injured while riding a material hoist and sued Thomas who rented the hoist to Vykruta's employer. Thomas pursued a third-party action for indemnity against Vykruta's employer. Judgment was entered in favor of Vykruta against Thomas and on appeal this was reversed and remanded with directions to enter judgment for Thomas. The court in reversing and remanding the cause relied upon more than one ground, one of which was that the hoist was not defective for the purpose for which it was designed and supplied and at page 303 said:

> "Also, there was no evidence that Thomas knew prior to the accident that the hoist was used for carrying personnel. If the plaintiff saw workmen riding on it and if he saw workmen at other jobs

186

riding hoists there is no evidence that this was done when representatives of the defendant were present, or that this information was communicated to the defendant, or that the defendant should have known that this was being done. Thomas rented a hoist that was to be used for a specific and limited purpose. The hoist was not defective for the purpose for which it was designed and supplied. Thomas had no obligation to station guards at the hoist to prevent Duff's employees from riding on it and it was not responsible for the misuse of its apparatus; that the plaintiff chose to ride on it rather than climb the available ladders did not transform it from a materials to a passenger hoist. Until such time as Thomas knew or should have known that the hoist was being used by workmen it had no duty to redesign the hoist. It is to no effect that Thomas knew the cable and pulley were exposed, for this condition was not dangerous to human beings if the hoist was used for its proper purpose—the lifting of materials. Even if a contractor is in charge of the work the evidence must show that on occasions prior to the injury the plaintiff or other workers had used as a scaffold or hoist an object not designed for such use and that this practice or usage was or reasonably should have been known to the defendant." Cases cited.

There is no evidence that the hoist in the case at bar was defective or in a dangerous condition. It was a material hoist and had been designed, erected and maintained to carry material not personnel. Plaintiff contends in the case at bar that he proved a violation of the Act when he adduced evidence that defendants allowed the material hoist to be used by personnel and such a use was dangerous and in violation of the Act.

■ Plaintiff relies upon one isolated instance of observing a mason contractor ride the material hoist to establish that defendants knew or should have known that the hoist was being utilized by personnel. There is no evidence as to who also was present at that time. Shapiro, the architect, who was at the site five days a week for two or three hours a day testified he never saw any personnel riding the material hoist. The evidence relied upon by plaintiff to charge defendants with a wilful violation of the Act is not sufficient to establish a practice or usage that was or by the exercise of reasonable care could have been discovered and made known to them. Plaintiff also contends that the act of bringing plaintiff down from the second floor on the material hoist, after he incurred his injury, is further evidence of the use of the hoist to carry personnel. This was obviously an emergency use of the hoist and not evidence of a practice or usage relied upon by plaintiff. We therefore find no evidence to establish a wilful violation of the Act.

In determining that the court properly directed a verdict in favor of defendants we have assumed arguendo that defendants were in charge of the work. We therefore need not consider plaintiff's contention that defendants were in charge of the work.

We affirm the judgment directing a verdict in favor of defendants.

Judgment affirmed.

DRUCKER, P. J. and LEIGHTON, J., concur.