JOHN BASDEN, Plaintiff-Appellant, *v.* KIEFNER BROTHERS, INC., Defendant-Appellee.

Fifth District    No. 79-637

Opinion filed December 29, 1980.

Law Offices of William W. Schooley, of Granite City, for appellant.

Robert E. Ryan, of Alton, for appellee.

Mr. JUSTICE HARRISON delivered the opinion of the court:

Plaintiff John Basden appeals from a judgment entered by the circuit court of Madison County on a jury verdict in favor of defendant Kiefner Bros., Inc. On appeal he contends that (1) the trial court erred in failing to rule as a matter of law that defendant was in charge of the work under the Structural Work Act; (2) the defense of contributory negligence was erroneously presented to the jury; (3) the jury was improperly influenced by the presence during its deliberations of an entire contract rather than

the exhibit in its excerpted form; (4) hearsay evidence was improperly admitted at trial; (5) the trial court erred by granting defendant's motion *in limine*; (6) the trial court improperly refused to give a requested jury instruction. We reverse and remand for a new trial.

Plaintiff was employed by Joe Dittrich, d/b/a Air Tite Window Company, as a carpenter. Mr. Dittrich had been hired as a subcontractor by Kiefner Bros. for the replacement of windows at certain schools, pursuant to a contract between the Board of Education, Shawnee Community District No. 84 as owner, and Kiefner Bros. as general contractor. The contract for renovation work at numerous schools included a school at Grand Tower, Illinois.

Plaintiff testified that on Sunday, June 29, 1975, he met Mr. Dittrich at the Air Tite office in Granite City, Illinois, to pick up a scaffold, torches, tarpaulin, and other necessary tools for the job. On Monday, June 30, plaintiff drove to Grand Tower and laid out the windows which had been shipped to the gymnasium jobsite, laid down the tarpaulin and erected the scaffold. Plaintiff stated that the scaffold was aluminum with rollers on the bottom, and was 7 feet high, 2 feet wide and 6 feet long. A plywood platform was placed across the top of the scaffold. The windows which were to be removed were 14 to 16 feet above the gymnasium floor according to plaintiff.

Plaintiff further testified that on Tuesday, July 1, 1975, he and Kevin Gordon began work at the site. Plaintiff had not seen any employee of Kiefner Bros. that morning although he sought one out. Plaintiff placed his own 12-foot aluminum extension ladder on top of the scaffold to reach the work area. Plaintiff said he wedged the ladder in a wall radiator between the floor and window on which he was working, with the top of the ladder sticking out of the window, but he did not tie down the ladder in any other way. He testified that he had been up three or four rungs of the ladder working for approximately two minutes when the entire scaffold flipped out from the wall, and he fell with the ladder beneath him, causing extensive injuries. Plaintiff stated that neither the ladder nor the scaffold was defective and that the scaffold was solid with no foreign substance on the wooden platform. This fall occurred at approximately 10 a.m.

Plaintiff testified to the extent of his injuries and the testimony of physicians and other witnesses was presented to establish damages. Mr. Edwin Kiefner, president of Kiefner Bros., testified for the defense as well as Wayne F. Meyer, the Kiefner Bros. superintendent on the site. Mr. Meyer testified that three jobsites were involved in the contract— McClure, Wolf Lake and Grand Tower, Illinois—and that work at all three sites was being performed simultaneously. Mr. Meyer said he had stopped at the other sites on the morning of July 1, and arrived at Grand

Tower at approximately 10:30 a.m. Mr. Meyer did not see plaintiff, but observed the scaffold properly standing inside the gymnasium. He also testified on cross-examination that pursuant to the contract, with which he was familiar, he was the superintendent in charge of safety and the safety representative on the job. However, he said he never asked plaintiff about safety, the type of equipment he would use, or whether he would use a ladder. Following argument and instructions, the jury returned a verdict in favor of defendant, Kiefner Bros.

■■ Appellant first contends that the trial court erroneously denied his motion for a directed verdict on the issue of "having charge of" the work at the close of plaintiff's case. Section 9 of the Structural Work Act provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building * * * or other structure within the provisions of this act, shall comply with all the terms thereof * * *.
>
> * * *
>
> For any injury to person * * * occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby * * *." (Ill. Rev. Stat. 1975, ch. 48, par. 69.)

It is well-established that "having charge of" does not carry with it a precise definition.

> "The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in *People v. Gould,* 345 Ill. 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of.' Thus, while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not *necessary or conclusive factors, nor is either made a sine qua non* for liability under the statute. Rather, consistent with its beneficient purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum pro-

tection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure." (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-22, 211 N.E.2d 247.)

Rather, we must look to the totality of the circumstances to determine if Kiefner Bros. had charge of the work at the Grand Tower school (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 490, 394 N.E.2d 403), and decide whether all the evidence, when viewed most favorably to Kiefner Bros., so overwhelmingly favors appellant that no contrary finding could ever stand. See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

The agreement entered into between the Board of Education, Shawnee Community District No. 84, as owner, and Kiefner Bros., as contractor, entitled "Standard Form of Agreement Between Owner and Contractor," provided for the "General Contract Work on the Renovation Work" pursuant to architectural plans and other documents. One of these other documents, "General Conditions of the Contract for Construction," provided among the following:

"4.3 SUPERVISION AND CONSTRUCTION PROCEDURES

4.3.1 The Contractor shall *supervise* and *direct* the Work, using his best skill and attention. He shall be *solely responsible* for all construction means, methods, techniques, consequences, and procedures and for coordinating all portions of the Work under the Contract.

* * *

4.9 SUPERINTENDENT

4.9.1 The Contractor shall employ a competent superintendent and necessary assistants who *shall be in attendance at the Project site* during the progress of the Work. The superintendent shall be satisfactory to the Architect, and shall not be changed except with the consent of the Architect, unless the superintendent proves to be unsatisfactory to the Contractor and ceases to be in his employ. The superintendent shall represent the Contractor and all communications given to the superintendent shall be as binding as if given to the Contractor. Important communications will be confirmed in writing. Other communications will be so confirmed on written request in each case.

* * *

10.1 SAFETY PRECAUTIONS AND PROGRAMS

10.1.1 The Contractor shall be responsible for *initiating, maintaining* and *supervising* all safety precautions and programs in connection with the Work.

10.2 SAFETY OF PERSONS AND PROPERTY

10.2.1 The Contractor *shall* take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

1. all employees on the Work and all other persons who may be affected thereby;

2. all the Work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of the Contractor or any of his Sub-contractors or Sub-sub-contractors; and

3. other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

10.2.2 The Contractor *shall* comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss. He *shall* erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities.

\* \* \*

10.2.5 The Contractor *shall* designate a responsible member of his organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated in writing by the Contractor to the Owner and the Architect." (Emphasis added.)

These sections were admitted as plaintiff's evidence and portions of these provisions were also read to the jury.

Also, Edwin K. Kiefner, president of Kiefner Bros., Inc., testified under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60) as follows:

"Q. \* \* \* You were the general contractor on the job for the projects of the Shawnee Community District?

A. Yes, sir.

Q. One in particular was the Grand Tower school?

A. Yes, sir.

Q. You had a subcontractor, Air Tite, and maybe one other one on the job?

A. Or two of them.

Q. Painting, maybe electrical?

A. Roofing, I think.

Q. You as general contractor are responsible to the owner for those persons, is that correct?

A. Yes, sir.

Q. You as general contractor are in charge, over all charge of that project?

A. Yes, sir.

Q. On all things, including safety, isn't that correct?

A. Yes, sir.

\* \* \*

MR. SCHOOLEY: Now, the general conditions, which you identified, sir, are now in evidence. I am sure you have read these. They are standard forms aren't they?

A. Yes, sir.

Q. You find this in all school work?

A. Or something similar, yes, sir.

\* \* \*

MR. SCHOOLEY: You are in charge over all on the project, including safety, and I think it specifies in the general conditions that that is one of your duties under the contract, isn't that correct?

A. I don't have it memorized. But if it is in there.

Q. Can I show it to you?

A. Yes.

Q. Referring specifically to Paragraph 10 of Article X, Provisions 10.1.1 and 10.2.1. See if it isn't stated in the contract you will have responsibility for safety.

A. That is the whole Article X. It is devoted to safety.

Q. And in essence it says you are responsible for safety on the project, isn't that correct?

A. For reasonable precautions, yes, sir.

Q. Including not only your employees but the subcontractors too?

A. That is what we are here about.

Q. Doesn't it state that in there?

A. This is general. If you want to direct me to a specific line I will read it.

Q. 'The contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work,' isn't that what it says?

A. Yes.

Q. Doesn't 'work' here infer all work done on the job?

A. I would think it does. Everything under contract to me.

Q. And the windows were part of the things under contract to you, weren't they?

A. Yes.

Q. 'The contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to all employees on the work and all other persons who may be affected thereby?'

A. Yes, sir.

Q. And, of course, that would include all work contracted for, which would include the windows, wouldn't it, sir?

A. Yes, sir.

* * *

Q. All right. Grand Tower. Did you make any arrangements for any members of your company or yourself to go down to the job to see whether the people working there for Air Tite would be working in safe conditions?

A. I don't know if I did or not.

Q. You didn't yourself?

A. I did not.

Q. Did you give any instructions to Mr. Meyer to do that?

A. To go to the job?

Q. To go to the Grand Tower job and check out safety for Air Tite.

A. I don't remember.

Q. And you don't know whether he was there?

A. I know what he told me.

Q. What did he tell you?

A. He was there after the accident.

Q. He told you he was not there prior to the accident?

A. On Tuesday?

Q. On Tuesday.

A. Yes, I think that is what he told me.

Q. He told you he was not on the job on Monday either?

A. I am not sure about Monday.

Q. But you received notice a week or so prior to the accident they would be starting on Monday, isn't that correct?

A. I am sure I expected them here. I have to say in many cases people notify us they are going to be there but for one reason or another they are not always present. They come early or come late.

Q. You were notified?

A. Yes, sir, we were."

Mr. Kiefner also testified on direct examination as follows:

"Q. Does Kiefner Brothers, Inc. presently have a safety program?

A. Yes, sir, we do.

Q. How long has that been in effect?

A. There has been a formal written program since April of 1973.

Q. Describe it briefly.

A. Well, well, it is a guideline. There are people in charge in the field with a checklist that they can use to remind them of what needs to be done to make the job safe. They also have a little pocket sized booklet furnished to them, which is more convenient to carry in their pocket than the federal register which was entered into evidence. In addition, we get periodic safety requirements from an association we belong to which we pass along on payday to the field. Their duties are to be the eyes and ears of employment out in the field to offer safe practices and to stop something they see that is unsafe.

MR. RYAN: No further questions.

## CROSS EXAMINATION
### By Mr. Schooley

Q. I believe your last statement was they were to stop something they see that is unsafe?

A. That is correct."

Defendant contends that the jury could properly conclude it was not in charge of the work because none of its employees were on the scene at the time of appellant's fall, it had no way of knowing that appellant had taken material to the jobsite the day before the fall and whether the scaffolding, ladders and other equipment were safe, and it did not know appellant would be working on the day in question. While we agree with defendant that generally the question of "having charge of" work is one for the jury, we do not find that to be the case here. Whether or not these propositions are all so is without import because defendant contracted that it would have a superintendent on the scene whose duty it was to control the work and prevent accidents, which person would know of appellant's and the equipment's presence and condition, and that it would initiate, maintain and supervise all safety precautions in connection with the work. (See *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 119, 373 N.E.2d 1348.) Moreover, Mr. Kiefner admitted that certain of his field personnel were obliged "to stop something they see that is unsafe." Wayne Meyer, Kiefner's superintendent, similarly testified to these duties. Given these circumstances, we do not

believe that reasonable people could disagree about whether Kiefner Bros. was in charge of the work. Rather, the evidence overwhelmingly demonstrates that it was.

■■ Defendant contends that directing a verdict on a single issue or element of a case is a contradiction in terms and is without force in the law. However, this procedure has been used in the past by applying the *Pedrick* standard (see *Long v. Duggan-Karasik Construction Co.* (1974), 23 Ill. App. 3d 812, 829-30, 320 N.E.2d 553 (directed verdict on issue of "having charge of" affirmed)), and rulings as matters of law on single issues in cases, such as the issue of contributory negligence, are common trial practice. We therefore find defendant's contention to be without merit and conclude that the trial court erred in denying appellant's motion on the issue of Kiefner Bros.' "having charge of" the work.

Appellant also contends that defense counsel consistently placed before the jury, in the form of argument, the issue of appellant's contributory negligence. It is well settled that contributory negligence is not a defense to a claim brought under the Structural Work Act. (*Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566, 568, 190 N.E.2d 315; *Gundich v. Emerson-Comstock Co.* (1960), 21 Ill. 2d 117, 130, 171 N.E.2d 60.) Yet, the following took place during closing argument:

"[MR. RYAN]: Prior to Mr. Meyer reaching the scene Mr. Basden erects a scaffold. He previously has erected this as a practical matter. Presumably he looked to see what he was going to do and presumably gauged the height of the windows. But in any event, come Tuesday he set up the scaffolding, placed it under the windows apparently, and then sees that he can't reach all of the window or the part that he has to reach. So he sets a ladder on top of it.

Now we have a scaffold which he says is two feet wide. Narrower than the chairs you are sitting in. It is seven feet high. About six feet long. He places that against the wall so that it sticks out from the wall twenty-four inches. Then this man, with twelve or fourteen years as a carpenter—

MR. SCHOOLEY: Your Honor, I am going to object. It is the law it makes no difference if John Basden violated the Structural Work Act or what his conduct was. It is not material. It is not to be considered by the jury. The issue is whether they committed it.

MR. RYAN: I am entitled to refresh the jury's recollection and review the testimony. That came from Mr. Basden's testimony, not mine.

THE COURT: Overruled. This is argument.

MR. RYAN: So, having constructed this scaffold, placed against the wall where it projects two feet out, and placing it along side,

parallel to and against the wall, this man, with twelve or fourteen years experience as a carpenter—

MR. SCHOOLEY: Show my continuing objection on this.

THE COURT: Contributory negligence is not a defense. Let the record so show.

MR. RYAN: The man Mr. Hopkins describes as a craftsman, takes pride in his work, then sets a twelve foot double extension ladder on this narrow platform. * * * Mr. Basden says there is no foreign material on the platform. No foreign material anywhere. There is no cause for this except the very simple physical elements involved. The principles involved. A high school Junior would recognize and back away from it. He proceeds to get on this ladder and it was doomed to fall from the minute he set foot on it. It had to fall.

Now I don't know whether Mr. Basden did not really recognize that or not. It seems to me that an ordinary reasonable person—

MR. SCHOOLEY: Objection, Your Honor. His conduct and his thoughts are not relevent.

THE COURT: It is not part of the defense but he may argue it. This is argument."

■■ Defendant responds that these arguments were directed to the issue of causation and that even if they were not, the jury instruction stating that contributory negligence was no defense cured any error. Yet, arguments regarding the actions of an experienced plaintiff and those of an ordinary reasonable person have no nexus with the issue of causation and we do not see how the jury instruction remedied the error when the trial court allowed argument regarding these matters. These arguments, in combination with the trial court's failure to find as a matter of law that defendant was in charge of the work, constitute reversible error.

Having found these issues dispositive of this appeal, we need not address the remaining contentions raised by appellant. The judgment of the circuit court of Madison County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

KASSERMAN, P. J., and JONES, J., concur.