2 Ill. App.3d 256 (1971)
276 N.E.2d 367
ANN JACOBSON, et al., Plaintiffs-Appellees,
v.
190 NORTH STATE STREET, INC. et al., Defendants-Appellants,  (190 NORTH STATE STREET, INC. et al., Third-Party Plaintiffs-Appellees,
v.
FRED HAMILTON, Individually and d/b/a FRED HAMILTON DECORATING CO., Third-Party Defendant-Appellant.)
No. 54877.
Illinois Appellate Court  First District.
November 9, 1971.
*257 *258 Howard and French, of Chicago, (Richard G. French, Stuart N. Litwin, and Gary E. Dienstag, of counsel,) for appellant.
John A. Doyle, Hugh J. McCarthy, and Joseph B. Lederleitner, all of Chicago, for appellee.
Robert L. Broady and George J. Gore, both of Chicago, for third-party defendant-appellant.
Reversed and remanded.
Mr. JUSTICE STAMOS delivered the opinion of the court:
This action was brought under the Structural Work Act of Illinois, sometimes referred to as the Scaffold Act (Ill. Rev. Stat. 1969, ch. 48, pars. 60, 69), to recover damages for the death of plaintiffs' father who fell from the top of an elevator cab while painting the elevator shafts in defendants' building. Defendants filed a third-party action against the decedent's employer, Fred Hamilton Decorating Co., seeking indemnity. A jury trial was held. At the close of all the evidence defendants moved for a directed verdict against plaintiffs and the third-party defendant. The third-party defendant moved for a directed verdict at the close of the third-party plaintiffs' case. The trial court granted a directed verdict for third-party plaintiffs and denied the other motions. The jury then returned verdicts in favor of John Jacobson for $4500, in favor of Mariann Jacobson for $7500, in favor of Anthony Jacobson for $3500 and in favor of the adult children as executors of the estate of their mother, Ann Jacobson, for $10,000. The posttrial motions of both the defendants and the third-party defendant were denied. Defendants and the third-party defendant have appealed from those orders.
On March 13, 1964, plaintiffs' decedent, August Jacobson, then employed by Fred Hamilton Decorating Co., was engaged in painting the elevator shafts in defendants' building, the State and Lake Building at 190 North State Street. He accidentally fell from the top of an elevator cab which he was using as a painting platform and died from injuries sustained in the fall.
Sometime prior to March 13, 1964, Fred Hamilton had been approached by John Engler, the building manager of the State and Lake *259 Building, concerning a smoke odor which had remained in the building following a recent fire. Hamilton had done painting work in that building for twenty-seven years. His recommendation regarding this problem was that, in addition to other renovations, the elevator shafts should be washed and painted. Engler concurred, and Hamilton submitted a written cost estimate. No written contract was executed.
Because this was an office building, and still in use, it was agreed that the work in the elevator shafts would be done after 5:00 P.M. each day. In lieu of a painting scaffold, Engler made available an elevator, whose top could be used as a painting platform. He also offered to supply either an elevator operator or, alternatively, to install a "whip," a remote control device which would allow the painters to operate the cab themselves. Hamilton selected the latter and Engler arranged for his electrician, Daniel Sarenac, to install the "whip" whenever it was needed. At approximately 4:30 P.M. each day the elevator needed for that evening would be taken out of normal service, equipped with a "whip" and turned over to the painters. Defendants do not contend that their agent, Engler, was unaware of either this routine or the purpose for which the elevator was used. Except for this elevator-scaffold, all painting equipment was supplied by Fred Hamilton from his storeroom in the basement. During the day the work was supervised by his foreman, who, before leaving at night, would also instruct the evening painters. No one from the building ever told the painters how to do their work, although instructions were given as to the use of the "whip."
On March 13, 1964, Jacobson and another painter, Norman Sorensen, arrived at the State and Lake Building at about 4:15 P.M. and entered an elevator cab at 4:30 P.M. They were taken to the twelfth floor by Sarenac who installed the "whip" before leaving the painters. The top of the cab was covered with oil droppings which were, in turn, covered by a drop-cloth. No railings or other safety device were used. Sorensen and Jacobson began painting the walls of the shaft, occasionally having to lean over the edge of the cab while holding the cable in order to reach the southwest corner. After about fifteen minutes of painting, Sorensen happened to turn around and saw Jacobson falling head first from the southwest side of the cab.

OPINION
As the basis of their appeal, defendants-appellants object to the failure of the trial court to direct a verdict in their behalf at the close of all the evidence. Specifically, they contend there was a failure of proof on the issue of "having charge," a failure sufficient to justify granting their motion pursuant to Pedrick v. Peoria & Eastern R.R. Co. *260 (1968), 37 Ill.2d 494, 229 N.E.2d 504. Plaintiffs-appellees respond that defendants' agents exercised considerable supervision over the work in general and the elevator-scaffold in particular, thereby rendering their principals "in charge" and subject to liability under the Scaffold Act.
 1, 2 Until 1961, Illinois law imposed upon an owner a duty of compliance with the Scaffold Act by the mere fact of ownership. Kennerly v. Shell Oil Co. (1958), 13 Ill.2d 431, 150 N.E.2d 134. This position was abandoned in Gannon v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co. (1961), 22 Ill.2d 305, 319, 320, 175 N.E.2d 785, which held that the plain words of the Scaffold Act precluded deletion of the element of "having charge":
"As aptly stated by the Federal court at p. 88 of the first Schmid opinion (154 F. Supp. 81), antedating the Kennerly case, `It was not the intention of the legislature that the owner should be liable regardless of who was in charge of the work, but to hold the person in charge of the work responsible regardless of whether it was the owner, contractor, sub-contractor, foreman or other person having charge of the building project. This can be the only logical conclusion. If the legislature intended otherwise, certainly more appropriate and clearer and less ambiguous language could have been used!"
Proof of ownership, without further evidence tending to establish that the owner was "in charge," is therefore insufficient to establish liability under the Scaffold Act.
 3-5 Whether one may be deemed as "having charge" of a particular project is an issue to be resolved upon the particular facts and circumstances of each case. While ownership is insufficient by itself, an owner may be "in charge" of any project or portion thereof over which he retains significant powers of control or supervision. Clearly, such supervisory powers must exceed the inherent right of an owner to observe the course of work or to terminate unsatisfactory performance. (Melvin v. Thompson (1963), 39 Ill. App.2d 413, 417, 188 N.E.2d 497.) Where an owner hires, instructs and inspects, and also either directs and controls the continuing operations or retains power to alter or change the work, such evidence raises an issue for a jury determination. Kobus v. Formfit Co. (1966), 35 Ill.2d 533, 221 N.E.2d 633.
The defendants-owners, 190 North State Street, Inc. and B & K Management Corporations, assert that they exercised only minimal supervision over the renovation conducted by an independent contractor, Fred Hamilton Decorating Co. According to Fred Hamilton's testimony, defendants' agent and building manager, John Engler, had orally contracted with him for the repainting of the elevator shafts in the State *261 and Lake Building. Hamilton had done painting work for that building for the past twenty-seven years. For this particular job, Engler had contacted Hamilton and informed him of a smoke odor in the building's elevator shafts, the result of a recent fire. It was Hamilton who recommended washing and painting the walls to relieve the odor. He testified repeatedly that no one representing the building management told him how to do his work; not then nor "ever" in the past twenty-seven years.
John Engler's testimony confirmed his minor role in initiating the painting work. He described his conversations with Fred Hamilton as "consulting" and added: "I asked him what needed to be done, tell me, tell him what our problem is and ask him if he could help us; and in this case, he could, most of it."
Norman Sorensen was painting from the same scaffold as plaintiffs' decedent when the latter fell to his death. He testified that both men were employed directly by Fred Hamilton Decorating Co. During the day Hamilton supplied his own foreman, who, before leaving, issued instructions to the evening painters. Sorensen testified that it was either Fred Hamilton or the foreman who instructed them to paint the particular shaft where decedent fell. All the painting equipment, except the elevator, was supplied by Hamilton from a storeroom which he exclusively maintained. In response to the question, "No one from the building told you how to do this work, did they?", Sorensen answered, "No."
 6 It is clear from the above testimony that defendants neither exercised nor retained any supervisory authority over the cleaning and painting of their elevator shafts. Their only input was supplying and maintaining the elevator-scaffold from which decedent fell. If defendants are to be held "in charge," such conclusion must stem from their conduct in relation to that elevator.
It cannot be disputed that defendants placed an elevator at the disposal of their painting contractor with full knowledge that it would be used as a scaffold. The record further discloses that defendants' electrician, Daniel Sarenac, adapted the elevator for such use by installing a "whip," a remote control device whereby the elevator could be operated from its roof by the painters. In addition, Sarenac testified that he cleaned and otherwise maintained all the building's elevators at least once a week. It is plaintiff's contention that the furnishing, adapting and continuing maintenance of the elevator were in themselves acts of supervision and control and sufficient to render defendants "in charge" for purposes of Section 9 of the Scaffold Act.
The proposition that the supplier of an instrumentality becomes "in charge" of the portion of the work utilizing that instrumentality was *262 considered in Vykruta v. Thomas Hoist Co. (1966), 75 Ill. App.2d 291, 221 N.E.2d 99, where the supplier was a lessor. In reversing a jury verdict for plaintiff the court stated at page 301:
"We do not agree with the first proposition of the plaintiff's thesis that a supplier of a hoist or scaffold comes under the Act and that the supplier can be held liable if the hoist or scaffold is defective * * *. The broad coverage advocated by the plaintiff ignores the limited application of Section 9 to those having charge of the construction. The mere furnishing of equipment does not render one in charge of the construction or that part of the construction in which the equipment is used."
The fact that the supplier in Vykruta also installed and periodically adjusted and repaired the instrumentality was of little significance to the court, since plaintiff's employer maintained primary responsibility for its operation.
In Campione v. Henry C. Lytton & Co. (1965), 57 Ill. App.2d 147, 206 N.E.2d 780, our court encountered the specific issue of the statutory liability of an owner who supplies an elevator to his contractor for use as a scaffold. The pertinent facts were virtually indistinguishable from those now before us. After noting the absence of any overall control or supervision by the defendant, the court addressed itself to plaintiff's primary argument at page 158:
"Plaintiff reasons that having furnished the instrumentality here involved  the elevator  Lytton was in charge of the instrumentality that was being used as an integral part of a scaffold.
* * *
The evidence in the instant case, however, taken in its aspects most favorable to plaintiff, established that Lytton parted with control of the elevator and the elevator shaft. There is no evidence that it exercised any control over or reserved the right to control the operation of the elevator after it had released it to Krahl. It fully appears that Krahl was in charge of the elevator and the elevator shaft for two months prior to the occurrence and that Krahl had adapted the elevator for use by it as a scaffold. We can see no basis in the evidence here to hold Lytton liable for a wilful or knowing violation of the Structural Work Act."
Plaintiffs seek to distinguish Campione in three ways. First, they note that the owner there parted with control of the elevator two months before the injury occurred. The testimony in the present case establishes that the owners parted with control of their elevator every day at approximately 4:30 P.M., adapting it for the painters' exclusive use during the evening hours. The fact of release is crucial; the period of time is not. *263 Second, significance is attributed to the fact that in Campione plaintiff's employer, not the owner, had adapted the elevator for use as a scaffold. Campione, however, stands for the proposition that release of control of the instrumentality releases the owner from his role of "having charge" of it. The extent of the owner's previous control over the elevator has no bearing on whether he was in charge of it after it was appropriated by his contractor. Third, plaintiffs contend that Campione was distinguished in Sola v. City of Chicago (1967), 82 Ill. App.2d 266, 227 N.E.2d 102, making Campione inapplicable where the defendant-owner retained an agent on the premises to supervise the work. This distinction is untenable in the case at bar, for there has been no testimony establishing the presence of such a supervising agent on the premises of the State and Lake Building.
 7 The most recent pronouncement of this court regarding the statutory liability of an owner-supplier was in Bruen v. Burton Auto Spring Corp. (1970), 266 N.E.2d 176. The rule of Vykruta v. Thomas Hoist Co., supra, that one who furnishes equipment is not necessarily "in charge" of the construction or that part of the construction in which the equipment is used, was extended to an owner who supplied an overhead crane for use as a scaffold. The court firmly rejected the argument that scaffolding was a severable portion of the overall work for purposes of determining those parties "in charge," 266 N.E.2d at 178:
"Our study of the cases, particularly those cited by plaintiff, leads us to conclude that in determining defendant's liability, it is irrelevant who had charge of the scaffold, unless this fact is related to having charge of the work."
Thus, a finding that defendants were "in charge" of the elevator-scaffold would not determine the issue before us. The fact that one is "in charge" of scaffolding does not necessarily render him "in charge" for purposes of Section 9 of the Scaffold Act, but is mere evidence bearing upon that ultimate issue.
 8-10 It is undisputed that plaintiffs have the burden of proving that defendants were parties "having charge" of the work, as required for liability under Section 9 of the Scaffold Act. A directed verdict should have been granted if all the evidence bearing on that issue, when viewed in its aspect most favorable to the plaintiffs, so overwhelmingly favored the defendants that no contrary verdict based on that evidence could ever stand. (Pedrick v. Peoria & Eastern R.R. Co., supra.) We hold that plaintiffs failed, as a matter of law, to satisfy their burden of proof regarding the element of "having charge." Neither defendants nor their agents exercised or retained general supervisory powers. The fact that they supplied and arguably had control of the elevator which served as *264 a scaffold is the only evidence of overall control of the work. Standing alone it did not raise a fact issue requiring a jury determination. Defendants' motion for a directed verdict against the plaintiffs should have been granted.
This cause is reversed and remanded with directions to vacate the judgment for plaintiffs and grant defendants' motion for a directed verdict. Because of this reversal, we further direct that the judgment for third-party plaintiffs on their indemnity action also be vacated.
Reversed and remanded with directions.
LEIGHTON, P.J., and SCHWARTZ, J., concur.