FRED COCKRUM, Plaintiff-Appellee, v. KAJIMA INTERNATIONAL, INC., a/k/a Kajima, Defendant-Appellant.

Fourth District   No. 4—92—0603

Opinion filed March 30, 1993.—Rehearing denied April 29, 1993.

404

STEIGMANN, P.J., dissenting.

Karen L. Kendall (argued), Robert V. Dewey, Jr., and Stephen J. Heine, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellant.

James W. Yoder (argued) and J. Stephen Yoder, both of Bloomington, for appellee.

JUSTICE KNECHT delivered the opinion of the court:
Defendant, Kajima International, Inc. (Kajima), appeals from a $500,000 McLean County jury verdict entered against it in favor of plaintiff, Fred Cockrum, for injuries he sustained while cleaning windows at the Diamond-Star Motors plant in Bloomington, Illinois. Kajima argues the evidence was insufficient to establish its liability under the Structural Work Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*) because (1) it was not "in charge" of the work being performed and (2) there was no evidence it willfully violated the Act. It also argues the trial judge erred by refusing to admit its jury instruction relating to the proximate cause of plaintiff's injuries. We disagree and affirm.

## I. FACTS

### A. *Cockrum's Testimony*
In November 1987, 56-year-old Cockrum was employed part-time by Atlas Window Cleaning, Inc. (Atlas). The injuries were incurred on Saturday, November 14, 1987, while he washed windows at the construction site for Diamond-Star Motors.

He initially worked at the site approximately a month before the November 14 accident. He had worked there four or five times before November 14. The other times he worked there were weekdays and he would work a couple of hours or a little longer. When he arrived at the site, he had to sign in at a guardhouse. Before entering the site, he had to tell who he worked for and the contractor at the Diamond-Star site with whom his boss subcontracted.

Atlas began the window cleaning project at Diamond-Star at the north end. When the accident occurred, approximately three-quarters

of the windows had been cleaned. Cockrum worked cleaning the windows from the inside and outside. The ladder Cockrum was using when the accident occurred was his personal ladder which his employer had borrowed sometimes for jobs. It was a 24-foot aluminum extension ladder. Cockrum had seen other people using aluminum ladders to clean the windows at Diamond-Star. Other people used Cockrum's ladder and he used it for other jobs he performed while working for Atlas.

Butch Jackson worked with Cockrum the day of the accident. Jackson was using one portion of a 28-foot ladder owned by Atlas. Cockrum was using both portions of his ladder. He testified it was his employer, Bernstein, who decided whether to use a ladder to wash the windows. No Kajima employee told him to use a ladder or that he could not use other means to clean the windows. Cockrum testified Bernstein had rented a "boom" to clean windows at a bank on one occasion and he had used the device where he was in a "bucket" on another occasion.

The day the accident occurred, Cockrum arrived at Diamond-Star at 8 a.m. or 9 a.m. He signed in at the security gate. Other people were working at the plant that day. Cleaning the windows was time-consuming because the glass had glue, caulking debris, dirt, and plaster on it which had to be scratched off with a razor. After removing these markings Cockrum washed the windows. Washing them involved two trips up and down the ladder. When he was on the ground the ladder was freestanding and had blown over two or three times before the accident.

Cockrum and Jackson had cleaned approximately 15 or 16 eight-foot windowpanes before the accident. He had to move the ladder twice to clean each pane. When the accident occurred, Cockrum felt the wind and the movement of the ladder. He tried to jump from the ladder, but his foot became entangled in a ladder rung. He landed on his hip and sustained injuries. The extent of his injuries is not at issue.

The ladder he was using was not defective when the accident occurred. He had used it all day. It had rubber feet. The windy conditions caused the ladder to fall. He had asked Bernstein to provide him a lift, a scaffold, or a "boom" to wash the windows at Diamond-Star, but Bernstein did not want to do so.

Cockrum had washed windows professionally for about 30 years. He had worked for Bernstein's father when he operated Atlas. Bernstein had operated the business for approximately 20 years. When Cockrum's injuries occurred, he had been on the ladder for approxi-

mately five minutes before the wind blew it over. When the wind caught the ladder, he was not square on the ladder, but was leaning over to scrape debris off a window. On November 14 Cockrum did not speak with any Kajima employee.

### B. *Max Cheatham*

Max Cheatham owns a glass company in Bloomington, Illinois, called JMC Glass & Mirror. He had worked as branch manager for Swanson Gentlemen (Swanson), a contractor which had done business in Bloomington also under the name Harkin Gentlemen. Swanson is no longer operating. Cheatham was responsible for the work Swanson was doing at the Diamond-Star site in 1987. It had a contract to install aluminum windows and glass and aluminum doors at the site. The contract also required Swanson to arrange to have the windows cleaned after they were installed.

Swanson originally subcontracted with ABC Window Cleaning (ABC), to clean the glass, but it was unable to perform the contract. After cancelling the contract with ABC, Cheatham hired Atlas to clean the windows. The contract between Kajima and Swanson required Swanson to notify Kajima and obtain written consent from a Kajima representative before subcontracting with any other company.

Cheatham did not know Atlas, Cockrum, or any other Atlas worker was working on November 14. The agreement between Swanson and Atlas did not require Swanson to provide any equipment for Atlas to use to wash the windows. Atlas was to provide its own equipment and personnel.

### C. *Kajima International*

Diamond-Star Motors was a 50/50 joint venture between Chrysler Corporation and Mitsubishi Corporation of Japan. It employed Mitsubishi International as a training company. It also employed Kajima as a design builder with full responsibility for designing and constructing the project within the specified requirements. The site for Diamond-Star covered 425 acres. The plant covered 48 acres.

Kajima had a contract with Mitsubishi International which required, in part, the design builder was responsible for supervision of safety precautions and programs in connection with the work. Kajima had a safety and jobsite manual. The manual states, in pertinent part:

> "This company is responsible for ensuring that all construction work on each project job site is performed in a safe manner and in conformity with all applicable Federal and State safety,

health, environmental, and fire regulations and standards, as well as accepted safe practices of the construction industry."

An additional provision states:

"The extent to which these objectives are met depends upon active management promotion and support of the program and the complete cooperation of job site supervisors and construction personnel in carrying out the following basic procedures:

1. Plan all work to minimize personal injury, property damage and loss of production time.

2. Maintain a system of prompt detection and correction of unsafe practices and conditions."

Terrence L. Reid was Kajima's manager during construction of the Diamond-Star plant and was primarily responsible for enforcing the safety and jobsite manual. He had been employed by Kajima for 7½ years. There were 35 to 40 prime subcontractors on the project to perform site work, landscaping, electrical, mechanical, foundation work, window work, and to construct caissons. Kajima hired an outside security service which was stationed at the gate.

In addition to manager Reid, there were a number of area supervisors who were construction managers. The safety director, Stan Wicker, was the coordinator of the subcontractors concerning safety. He is no longer employed by Kajima. Kajima required all subcontractors to implement and promote a full safety program. According to Reid, Wicker and his support staff met daily with subcontractors to ensure work was being performed safely. The safety department had 75 to 80 support staff, including a nursing staff and ambulances on site.

In response to questioning by Cockrum's counsel regarding who was responsible for safety on the site, Reid stated: "The safety program and the insurance of compliance with that program was fully our responsibility."

Reid testified most of the contractors were experienced and knew how to perform their work safely. The safety department continually monitored projects to ensure the jobs were being done safely. If a Kajima employee discovered a subcontractor performing work in an unsafe manner, Kajima could stop its work. Each subcontractor was required to make Kajima's safety manual part of its contract with Kajima and agree to carry out these safety programs.

Kajima also required each subcontractor to meet with its employees each Monday morning to tell them about safety issues and listen to any suggestions or complaints. Reid also stated each subcontractor

had to ensure each of its subcontractors was responsible for safety issues at the site.

On Fridays Kajima had a safety patrol during which a safety worker would take a supervisor or safety advisor to each location where a subcontractor was working. If they saw something required attention, they made sure it was corrected and indicated hazardous work areas. In addition, on the first Friday of each month they stopped the project at 12:30 and gathered all employees, supervisors, and managers together to discuss safety issues. Kajima also issued safety awards to recognize safe work by contractors and subcontractors.

Reid also testified Kajima did not designate how work should be performed. It was a standard within the industry for the contractor to determine the means for accomplishing a task. He also stated that while it is customary for subcontractors to furnish their own equipment, Kajima was authorized to stop work if equipment used or the method employed was not safe. It would have done so whenever it knew about problems.

### D. *Swanson as Subcontractor*

Swanson had a contract with Kajima as a subcontractor. Swanson is a specialty firm which installed curtain walls, an aluminum entry type of material, and glass and glazing. It did the glass and glazing for the project and subcontracted some of its contractual duties with Kajima, including cleaning the windows. Its work came toward the end of the construction project when the staff was thinner. The facility was turned over to Diamond-Star Motors March 1, 1988.

The contract Kajima had with Swanson required Swanson to take all reasonable safety precautions in performing its work and to comply with all safety measures initiated by the design builder including all Federal and State safety requirements and local regulations. It also stated Swanson remained responsible for the prevention of hazards to personnel and property, for the care, safety and protection of all materials, installed work, personnel, and equipment, and all items under the contractor's jurisdiction. The subcontractor was also responsible for correcting all unsafe conditions.

The contract also provided Swanson could not subcontract, assign or transfer its contract, or any part of it, unless Kajima consented in writing. Swanson was required to submit and obtain approval from Kajima before employing any subcontractor.

The glazing contract between Kajima and Swanson required Swanson to have the windows cleaned and washed upon completion of

glazing. The contract listed ABC as the subcontractor to perform the final window cleaning. Kajima did not consent to Swanson hiring Atlas to clean the windows. According to Reid, he learned Atlas was involved as a subcontractor at the Diamond-Star site Monday after Cockrum's injury because it was in the newspaper.

The windows Cockrum was cleaning when the accident occurred had a western exposure and were 15 to 18 feet above ground. They could be seen from the back door entrance of Kajima's offices. Reid opined the portable ladder was not being used properly when the accident occurred. The length of it prevented it from reaching the top of the building where it could have been tied off as required by Kajima's safety manual. A provision in it states: " 'Portable ladders shall be tied, blocked or otherwise secured to prevent the ladder from being unintentionally displaced.' "

Reid testified if he had seen a man on a portable ladder washing windows, he would have stopped the work. He listed a number of alternate methods for cleaning the windows which would have been more appropriate. A swing state or scaffolding could have been used. Mobile work platforms would also have been preferable. One of a number of types of mechanical lifts would also have been a proper way to safely reach the windows for cleaning.

Each subcontractor was required to complete a daily jobsite checklist for its work areas. One subheading with respect to ladders was whether they were properly tied off or secured against movement. Reid could not say whether these daily checklists were collected by Kajima. He explained this would have been the responsibility of the safety director, who was no longer employed by Kajima. He could only say he could not find them in Kajima's files.

Reid also testified that according to Kajima's rules, normal working hours for subcontractors were Monday through Friday, 8 a.m. to 4:30 p.m. Anyone working off-hours or unusual hours was to notify the security and safety department so Kajima could have people on the site while they were there. Kajima did not know anyone would be working at the site the day Cockrum was injured. However, a nurse and ambulance were present to attend to Cockrum after his fall. Reid explained they were at the site because Diamond-Star employees had begun moving in equipment. Kajima had not been notified by Atlas that Cockrum would be working at the site on November 14.

At the close of the evidence, Kajima's motion for a directed verdict was denied. The jury returned a $500,000 verdict in Cockrum's favor. Kajima filed a post-trial motion seeking a judgment *n.o.v.* Its motion was denied and this appeal followed.

## II. Liability Under Structural Work Act

### A. *Cause of Action as a Matter of Law*

Kajima contends the facts are undisputed and this court must conclude a cause of action could not, as a matter of law, have been maintained against it under the Act because plaintiff, an employee of a subcontractor, was injured on (1) a nonscheduled workday, (2) while using his own equipment. It also argues it could not have been liable under the Act because (3) it was not informed work would be performed on the nonscheduled workday, although notice was required to ensure safety personnel could be present; (4) the subcontractor of Kajima, Swanson, did not obtain prior written approval to subcontract its contractual duties to Atlas as required by its contract; (5) it did not know Swanson had subcontracted its contractual duties to Atlas; (6) it did not know the work which caused plaintiff's injuries was being performed on the nonscheduled workday; and (7) Atlas determined what equipment and method would be used to clean the windows.

To sustain a cause of action for violation of the Act, Cockrum must have established the following elements: (1) he was involved in a construction activity protected under the Act; (2) the activity took place on a structure covered by the Act; (3) a scaffold or similar device defined by the Act was being used; (4) the device was unsafe or not safely placed or located; (5) the unsafe condition proximately caused Cockrum's injury; (6) Kajima had charge of the work; and (7) Kajima willfully violated the Act. *Tracy v. Montgomery Ward & Co.* (1990), 193 Ill. App. 3d 304, 307-08, 549 N.E.2d 984, 987; *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 488, 531 N.E.2d 51, 55.

Defendant contends it is the final three elements which were missing from Cockrum's evidence at the trial level: (1) Kajima had charge of the work being performed; (2) Kajima willfully violated the Act; or (3) a defect attributable to Kajima proximately caused Cockrum's injuries.

Contrary to Kajima's contention, the proper standard to apply to determine whether a judgment *n.o.v.* or a directed verdict should have been granted is whether, when viewing the evidence most favorably to the nonmoving party, the evidence so overwhelmingly favors the moving party that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14; *Smith*, 176 Ill. App. 3d at 492, 531 N.E.2d at 57.) In this

case, the evidence was not undisputed regarding the alleged three missing elements in Cockrum's evidence.

### 1. Control Over Cockrum's Work

■ Defendant argues it was not "in charge of" plaintiff's work for the following reasons: (a) Swanson, the subcontractor to Kajima, violated its contract with Kajima by hiring Atlas without Kajima authorizing this arrangement, as required by its contract; (b) the evidence was undisputed Kajima did not know Cockrum was working at the site the day the accident occurred; (c) the evidence was undisputed Kajima did not know Atlas would be at the site the day of the accident; (d) the evidence was undisputed Kajima did not know, should not, and could not have known Cockrum or his employer was on the premises at any time; (e) plaintiff was injured while using his own ladder; and (f) the evidence was undisputed plaintiff and his employer were solely responsible for deciding what equipment and methods would be used to clean the windows.

Kajima directs us to cases which have affirmed summary judgments in favor of a defendant where the facts were undisputed and the court concluded as a matter of law defendant was not in charge of the work being performed when the injury occurred. Each case is distinct from the facts we address.

In *Puttman v. May Excavating Co.* (1987), 118 Ill. 2d 107, 110-11, 514 N.E.2d 188, 189-90, the Illinois Supreme Court concluded the defendant company was not in charge of the work where its only connection to a sewer line project was to provide the equipment and operators who worked under the supervision of plaintiff's employer, S. M. Wilson Construction (hereinafter Wilson), which had been hired to construct a hospital addition. The undisputed evidence showed Wilson retained all responsibility for determining, among other considerations, job safety, and could discharge the operators if it was dissatisfied with their performance. There was no evidence from which a jury could conclude the defendant company assured the safety of all workers at the site.

Kajima correctly notes the fifth district ruling in *Fisher v. Crippen* (1986), 144 Ill. App. 3d 239, 241-42, 493 N.E.2d 1204, 1205-06, concluded defendant was not liable under the Act for plaintiff's injuries when plaintiff provided his own equipment while delivering concrete blocks to defendant's home which defendant was independently constructing. However, unlike our scenario, there again was no claim defendant assured plaintiff's safety while plaintiff carried out his job

delivering the blocks and his hoist came in contact with low lying electrical wires.

Kajima is again correct in arguing that to be liable under the Act an owner of the property must have been in charge of the operation during which the injury occurred. The Illinois Supreme Court made this ruling in *Warren v. Meeker* (1973), 55 Ill. 2d 108, 111, 302 N.E.2d 54, 56. Not noted by Kajima, however, was the *Warren* court's observation the defendant company did not appear to have the authority "to stop plaintiff's work if it was being performed in a dangerous manner." *Warren*, 55 Ill. 2d at 112, 302 N.E.2d at 56.

Kajima's alleged liability for Cockrum's injuries is not based on its ownership interest in the property where Cockrum was injured. Kajima retained the authority to stop any contractor or subcontractor's work which was being performed in an unsafe manner. In fact, Reid testified if he had been aware the windows were being cleaned with portable ladders he would have stopped this work.

The Act does not impose absolute liability on all contractors, subcontractors, and other persons involved in the project on which a plaintiff is injured, but this principle does not bolster Kajima's position. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 318-19, 175 N.E.2d 785, 792.) Kajima's liability was not based on this principle.

Kajima relies on a third district ruling in *Marine Bank v. Archer Daniels Midland* (1987), 156 Ill. App. 3d 576, 579, 509 N.E.2d 163, 166, for its argument it could not have been liable for plaintiff's injury because Atlas had the sole responsibility for determining how plaintiff performed his work, when he was to do it, and what equipment would be used. Kajima also contends it was not in control because it was not informed Atlas was cleaning the windows, or that Atlas would be working on Saturday when safety personnel were not generally present.

The *Marine Bank* court based its ruling on the reasoning plaintiff's injury was not covered under the Act, the defendant company had no control over the operation, and plaintiff did not establish any willful violation of the Act by the defendant company. (*Marine Bank*, 156 Ill. App. 3d at 579, 509 N.E.2d at 165-66.) Kajima emphasizes only the *Marine Bank* court's rationale that the defendant company did not determine the manner and means by which the work was to be completed. However, an important additional characteristic not noted by defendant was the court also observed defendant had no authority over the safety of the construction project. (*Marine Bank*, 156

Ill. App. 3d at 579, 509 N.E.2d at 166.) Kajima retained full authority over the safety of all construction at the site.

In *Jacobson v. 190 North State Street, Inc.* (1971), 2 Ill. App. 3d 256, 263-64, 276 N.E.2d 367, 371-72, the first district ruled a directed verdict should have been granted for defendants where as a matter of law defendants were not found to have been in charge of the project during which plaintiff was injured. The court reached this conclusion although defendants had supplied and had some control over the elevator which was used as a scaffold.

Kajima relies on *Jacobson* in arguing as a matter of law it could not be liable for Cockrum's injuries because Cockrum and Atlas were not invited onto the site and their presence was unknown to Kajima. However, the evidence on these issues was in dispute and the trial judge was correct in leaving the ultimate determination to the jury.

Kajima's final argument relies on another first district ruling in *Zuelsdorf v. Montgomery Ward & Co.* (1978), 64 Ill. App. 3d 408, 413, 380 N.E.2d 1130, 1135, in which the court approved a jury verdict for defendant. The court reasoned the activities of defendant which established it was in charge of operations must be directly connected with the operations. Kajima correctly notes the court based its ruling on the absence by defendant of any authority to control the electrical work being performed. Moreover, defendant's foreman had *no* connection with performance of the work, supervision of workers, nor the right to discharge a worker.

These facts are again distinct from those we address. Kajima contends *Zuelsdorf* provides support for its claim it cannot be held liable under the Act because it was not in charge of the operation which involved the injury. Kajima contends in its brief that "all of the evidence" indicates only Atlas retained control over the window cleaning. It states in its brief, "the mere fact that Kajima was the design builder does not render it in charge of every aspect of the work at every moment." However, the evidence clearly characterized Kajima's role as more involved than only the design builder. In fact, Reid conceded on numerous occasions its primary responsibility was to carry out the safety precautions set out in its manual.

Although not relied on by Cockrum, or distinguished by Kajima, this court has ruled, "[o]ne possessing the right to stop the work if it is being done in a dangerous manner is a person 'having charge' within the meaning of the Act." (*Scrimager v. Cabot Corp.* (1974), 23 Ill. App. 3d 193, 196, 318 N.E.2d 521, 523, citing *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.) In *Scrimager*, the court concluded the defendant company which had a contract with the plain-

tiff's employer, which provided defendant had a right to stop painting work if it were being done in an unsafe manner, could be liable under the Act because it retained control over the painting task. Plaintiff fell from a roof while painting. *Scrimager*, 23 Ill. App. 3d at 196, 318 N.E.2d at 523.

Cockrum relies on the first district ruling in *Pantaleo v. Gamm* (1969), 106 Ill. App. 2d 116, 245 N.E.2d 618. Cockrum contends it presents similar facts because the court rejected the defendant company's argument it was not in charge of the work because its workers had not been present at the work site the day the accident occurred or for 13 days before the accident. (*Pantaleo*, 106 Ill. App. 2d at 125-26, 245 N.E.2d at 623-24.) However, this does not address whether liability fails in the present case because Kajima required notice if subcontractors wished to work during nonwork hours.

*Pantaleo* (106 Ill. App. 2d 116, 245 N.E.2d 618) and *Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 186, 498 N.E.2d 522, 526, do support the principle a defendant company which retains control over the entire work project can be held liable under the Act. Kajima retained such control over the Diamond-Star site. It was in charge of security and safety issues and could stop work it found to be contrary to its safety rules.

Kajima contends the following facts as undisputed: (1) it did not know, nor could it have reasonably known, Swanson subcontracted for the window cleaning with Atlas, and (2) it could not have agreed to be in charge of Cockrum's work because it did not know, nor could it have reasonably known, Cockrum would be working at the site when the accident occurred. However, these facts were in dispute.

Testimony showed Kajima hired the security firm which operated the guardhouse at which all persons entering the site had to stop, report who they worked for and from what company their employer had subcontracted the work they were performing. Although Kajima argues in its reply brief there was no evidence it had authority over the security firm, neither was there evidence presented to the contrary. The only evidence presented, that Kajima hired the firm, combined with the fact Kajima was in charge of security, could reasonably have been viewed by the jury as evidence Kajima could have learned or did learn Atlas had assumed Swanson's duty to have someone clean the windows.

In addition, if the security records were checked or used in day-to-day operations, Kajima could have known Cockrum, and the numerous additional workers present on the weekend day on which the accident

occurred, were present at the site and were performing subcontractor tasks.

The evidence included facts which were in dispute. A directed verdict or judgment *n.o.v.* would not have been proper under these circumstances. Whether a defendant had charge of the work within the meaning of the Act is primarily a question for the jury. (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 101, 338 N.E.2d 868, 873.) The trial judge properly placed this determination in the control of the jury.

## B. *Was a Willful Violation Established?*

■■ Kajima also contends a willful violation of the Act was not established because the evidence showed it did not know, nor could it, or should it reasonably have discovered the support device—the ladder used by plaintiff—was a dangerous condition. A willful violation of the Act occurs only when evidence shows defendant knows or, in the exercise of reasonable care, should know the dangerous condition exists. *Smith*, 176 Ill. App. 3d at 55.

Kajima argues Cockrum's use of a ladder improperly on a nonscheduled workday was not reasonably discernible. It contends the Illinois Supreme Court ruling and a first district ruling relied on by Cockrum are distinct because in each, the defendant company had a representative on the site who could have discovered the dangerous condition. *McInerney*, 62 Ill. 2d at 100-01, 338 N.E.2d at 873; *Ryan v. E.A.I. Construction Corp.* (1987), 158 Ill. App. 3d 449, 459, 511 N.E.2d 1244, 1250.

Kajima's citation to the fifth district ruling in *McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 481 N.E.2d 787, does not support its argument that the improper use of a ladder at the Diamond-Star site, at which it was responsible for ensuring safe construction practices, was not readily discernible. In *McMahon*, plaintiff was injured when he fell from a ladder which had been set on ground which caved in. *McMahon*, 135 Ill. App. 3d at 217, 481 N.E.2d at 791.

Similarly, in a previous ruling by this district, plaintiff's injury was incurred when he slipped on ice which had formed within only an hour and 15 minutes after plaintiff and his co-workers had travelled the same steps to return from lunch and noted no ice formation. (*Smith*, 176 Ill. App. 3d at 491, 531 N.E.2d at 57.) In both cases the dangerous condition arose quickly and could reasonably have been viewed as outside defendant's expectation such danger would arise.

Cockrum had used the same ladder without securing it on four or five additional occasions on weekdays. By the time Cockrum was injured, nearly three-quarters of the windows had been cleaned. Cockrum had seen others cleaning the windows in this fashion. The site where the windows were being cleaned could be seen from Kajima's office location. With 70 to 80 employees entering the rear of the building on occasion each day, it was reasonable to conclude, as the judge did, there was a factual question about whether a Kajima employee should have previously noted the dangerous technique employed for cleaning the windows.

Reid testified there was a safety checklist which was to be filled out by each subcontractor weekly. However, he did not know if Kajima personnel reviewed or even collected these weekly checklists. He could find no record of the safety checklists in Kajima's files. If the checklists had been reviewed, Kajima could have discovered (1) a subcontractor which it was allegedly not aware of was cleaning the windows; and (2) it was using an unsafe technique contrary to the safety policies established by Kajima and which were to be followed.

Kajima had 70 to 80 employees hired to ensure safety policies were being followed. No Kajima safety employee noted the dangerous technique used for cleaning the windows even though workers had used it on numerous occasions. Furthermore, Kajima's reliance on the argument it could not have known Atlas' workers were cleaning the windows is also unconvincing.

Kajima was in charge of security and safety issues. Kajima hired the security for the gatehouse through which all persons entering the site had to pass and record who they worked for and the company their employer subcontracted with. If Kajima had inspected the records of the gatehouse indicating who entered the site, it could easily have determined the windows were being cleaned by Atlas.

Kajima's argument it is not reasonable to have expected it to know workers would be present at the site the day of the accident also fails. Clearly the security guards were aware of all who entered. Testimony indicated there were numerous workers admitted the day the accident occurred. If admission was barred, security should have kept the workers from entering the site. If the jury concluded Kajima was in charge of the work, it could also conclude Kajima knew or, in the exercise of reasonable care, should have known about how the ladder was being used and that workers might be present at the site on the day of the accident.

There were factual questions about whether Kajima could reasonably have discovered the dangerous condition employed for cleaning

the windows at the Diamond-Star plant. The trial judge properly denied Kajima's motion for a directed verdict and judgment *n.o.v.*, and left the determination of these questions in the control of the jury.

## III. JURY INSTRUCTIONS

■ Defendant argues in the alternative it should receive a new trial because of the trial judge's prejudicial error which occurred when the jury was not properly instructed Cockrum had to prove Kajima's willful violation of the Act proximately caused his injury.

Kajima submitted the following instruction:

"If you decide that the plaintiff has proved all the propositions of his case under the Structural Work Act, then it is not a defense to the plaintiff's claim that some conduct on the plaintiff's part may have contributed to cause the injury.

However, if you decide that the sole proximate cause of the occurrence was the conduct of the plaintiff, then you should find for the defendant."

Although initially described as a modified version of Illinois Pattern Jury Instructions, Civil, No. 180.17 (3d ed. 1992) (hereinafter IPI Civil 3d), after further discussion, defense counsel indicated the instruction was not a recognized modification of IPI Civil 3d No. 180.17, but an alternative to IPI Civil 3d No. 180.19.

The trial judge provided the following jury instruction submitted by Kajima:

"More than one person may be to blame for causing an injury. If you decide that the plaintiff has proved all the propositions of his case, then it is not a defense to the plaintiff's claim that some third person who is not a party to the suit and plaintiff's employer may also have been to blame.

However, if you decide that the sole proximate cause of the injury to the plaintiff was something other than a violation of the Structural Work Act by the defendant, then your verdict should be for the defendant." IPI Civil 3d No. 180.19, at 180-53.

In addition, the jury responded in the affirmative to a special interrogatory submitted by Kajima which found Kajima had violated the Act. The jury was properly instructed and its response to the special interrogatory indicates it knew in order to find Kajima liable for Cockrum's injuries it must determine whether Kajima violated the Act.

## IV. CONCLUSION

The trial judge properly denied Kajima's request for a directed

verdict at the close of the evidence and for a judgment *n.o.v.* after the jury ruled against it. The evidence presented a question of fact about whether Kajima was "in charge" of the work being performed when Cockrum was injured and whether Kajima willfully violated the Act. In addition, the trial judge did not err by denying defendant's jury instruction. The jury was properly instructed.

Affirmed.

COOK, J., concurs.

PRESIDING JUSTICE STEIGMANN, dissenting:

Dissenting judges commonly state that they "respectfully dissent" even when one suspects that their claim reflects tradition more than reality. In this case, I truly do respectfully dissent because the majority opinion, in many ways, is compelled by previous decisions of the supreme court and the appellate court, which in turn are constructions of the Act—an historical anomaly that has long since outlived its reason for existence.

That the defendant in this case should be ordered to pay this plaintiff a half million dollars in many ways confirms what much of the public already suspects: that the law truly is an ass. Further, until the General Assembly finally abolishes the Act or the supreme court reinterprets it to avoid some of its more ridiculous applications (particularly this very case), the verdict here should stand as a semaphore, warning prospective businesses thinking of locating in this State that they will be treated like so many "marks" in a legal system that works like a confidence game.

The majority opinion states that defendant correctly argues that to be liable under the Act, an owner of the property must have been in charge of the operation during which the injury occurred. (243 Ill. App. 3d at 412.) However, the majority then notes that the supreme court decision stating this ruling, *Warren* (55 Ill. 2d at 111, 302 N.E.2d at 56), also observed that the defendant company in *Warren* did not appear to have the authority to stop plaintiff's work if it was being performed in a dangerous manner. (243 Ill. App. 3d at 412.) Although the majority correctly reads *Warren*, surely the supreme court could not have meant the full implications of that statement. After all, if a homeowner contracts with a roofing company to repair his roof and, upon returning home from work, observes a roofer performing circus stunts on the homeowner's roof, surely he has the authority to order the work stopped because it is being performed in a dangerous

manner. But if the roofer fell 15 minutes before the homeowner came home and injured himself as a result of doing his circus stunts, should the homeowner still be liable because, had he returned home in time, he "could have stopped the work from being performed in a dangerous manner"? To so hold does not make any sense. This example reveals just one of the areas that the supreme court must address as long as Illinois citizens continue to be burdened by the Act.

Although the majority opinion also correctly states that the Act in theory does not impose absolute liability on prospective defendants (243 Ill. App. 3d at 412), reality indicates to the contrary, as shown by cases like the present one. This case in particular and the Act in general represent the worst aspects of the "indemnification society" that we have become. Here, defendant essentially did nothing at all wrong, yet is being punished for having expressed its concern for the safety of its workers although it could not guarantee that its workers would not be injured (or, as here, injure themselves because of their own gross negligence).

Clearly defendant would have been much better off had it never said anything on the subject of worker safety or had it tried to shift all safety concerns to others. This half million dollar judgment provides a perverse disincentive for contractors to set forth in writing their goal of providing a safe workplace and the steps they plan to utilize to achieve that goal. Further, one can hardly dispute, based on this case, that the more safety concerns a contractor expresses, the higher a standard plaintiff's counsel will argue the contractor has set for itself, and the bigger (and more expensive) the fall that awaits the contractor.

The majority opinion also states the following: "A willful violation of the Act occurs only when evidence shows defendant knows *or, in the exercise of reasonable care, should know* the dangerous condition exists." (Emphasis added.) (243 Ill. App. 3d at 415.) The majority cites *Smith* (176 Ill. App. 3d at 488, 531 N.E.2d at 55) as support for this holding. In turn, *Smith* cites *Kohutko* (148 Ill. App. 3d at 187, 498 N.E.2d at 526 ("[f]or a wilful violation, it is only necessary that the defendant know, or in the exercise of reasonable care should have known, of the existence of a dangerous condition")), which cites *Blake v. Tri-State Crane Service, Inc.* (1983), 114 Ill. App. 3d 1059, 1067, 449 N.E.2d 946, 953 ("[a] violation of the Act is wilful when a person having charge of the work knew or, in the exercise of ordinary care, should have known of a dangerous condition"), which cites *Lavery v. Ridgeway House, Inc.* (1969), 117 Ill. App. 2d 176, 186, 254 N.E.2d 117, 122 ("[t]here can be no liability under the Act without ev-

idence that the Act was violated and that such violation was 'wilful' ''), which—finally—cites a *supreme court* decision, *Gundich v. Emerson-Comstock Co.* (1960), 21 Ill. 2d 117, 129, 171 N.E.2d 60, 67, where the supreme court wrote the following: "The term 'wilfully' in the Scaffold Act has been construed by this court to be synonymous with 'knowingly,' and it is not necessary that there be a reckless or wanton disregard of the provisions of the [A]ct in order to constitute an actionable violation thereof."

How did we get from the supreme court's construction of the term "willfully" as being synonymous with "knowingly"—a not particularly remarkable interpretation—to the present state of the law, as stated in *Smith* (176 Ill. App. 3d at 488, 531 N.E.2d at 55), that a willful violation of the Act occurs not only when the evidence shows the defendant acted willfully or knowingly but, *in the exercise of reasonable care, should have known* that the dangerous condition existed? I submit the Act is bad enough without this judicial gloss that the appellate court has given it that, in effect, renders a contractor absolutely liable for injuries suffered by its structural workers. As the present case all too starkly reveals, a claim that a contractor "in the exercise of reasonable care, should have known that the dangerous condition exists" is almost impossible to defend, especially if the contractor is foolish enough to ever express any concerns about—or to take any steps to address—the safety of its workers.

As a simple matter of statutory construction, even if a "willful" violation of the Act is synonymous with a "knowing" violation of the Act, how can this court possibly countenance a finding of a *willful* violation of the Act—which is, after all, the statutory term—when the evidence here shows that the defendant in fact did not know of the dangerous condition but perhaps should have? To hold that a defendant under these circumstances "willfully" violated the Act is the judicial equivalent of holding up is down, green is blue, or right is left. The "should have known" standard applies to simple negligence; it has no place in an analysis of a standard that provides liability only for a "willful" violation.

In conclusion, I add again that I disagree not so much with the particular decision in this case as with the Act itself and the judicial gloss that has been given to it. The time has come to chip away at the patina of this ill-thought-out precedent, and this case would be a good place to start.