GEORGE V. KING, Plaintiff-Appellant, v. MICHAEL OWEN, d/b/a Owen Construction, *et al.*, Defendants-Appellees.

Fourth District   No. 4—93—0545

Argued January 25, 1994.—Opinion filed March 10, 1994.—Rehearing denied April 28, 1994.

Kevin P. Fitzgerald (argued), of Thomson & Weintraub, of Bloomington, for appellant.

D. Kendall Griffith, Kirk Holman, and William P. Hardy (argued), all of Hinshaw & Culbertson, of Chicago, for appellee Owen Construction.

John P. Fleming (argued) and Matthew B. Smith, both of Quinn, Johnston, Henderson & Pretorius, of Peoria, for appellee McLean County Service Company.

JUSTICE GREEN delivered the opinion of the court:

Plaintiff George V. "Vince" King filed an action in the circuit court of McLean County on May 22, 1990, against defendants Michael Owen, d/b/a Owen Construction (Owen), McLean County Service Company (F.S.), and Modahl & Scott, Inc. (Modahl). Plaintiff sought recovery under the Structural Work Act (Act) (Ill. Rev. Stat. 1989, ch. 48, pars. 60 through 69) for injuries he received when he fell from a roof. The case proceeded to trial against defendants Owen and F.S., and on March 22, 1993, judgment was entered on general jury verdicts in favor of both defendants and against plaintiff.

Plaintiff maintains on appeal: (1) the jury's verdicts were so contrary to the evidence that a judgment in favor of plaintiff must be entered *n.o.v.*, or alternatively, were against the manifest weight of the evidence and a new trial should be granted; and (2) the trial court erred in denying plaintiff's motion for a directed verdict on the question of whether defendant F.S. was "in charge" of the jobsite.

We conclude the verdicts were not against the manifest weight of the evidence. Plaintiff concedes that the argument relating to the question of whether F.S. was "in charge" is relevant only if we find that plaintiff is entitled to a new trial or a judgment *n.o.v.* Thus, we

need not decide whether the trial court erred in denying plaintiff's motion for a directed verdict on this issue. We affirm.

Plaintiff alleged in his complaint that defendant Owen was a contractor, and defendant F.S. was a general contractor engaged in the repair and replacement of the roof of a building owned by defendant Modahl. He further alleged he was working on the construction and repair of the roof of that building on September 17, 1989, when he was injured as a result of his fall through the roof to a concrete floor, 30 feet below. Plaintiff alleged his injuries were the proximate result of defendants' wilful violations of the Act.

The Act provides as follows:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." (Ill. Rev. Stat. 1989, ch. 48, par. 60.)

The Act further provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this Act, shall comply with all the terms thereof ***.
>
> * * *
>
> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby ***." Ill. Rev. Stat. 1989, ch. 48, par. 69.

In order to sustain a cause of action for a violation of the Act against an employer, the plaintiff must establish the following: (1) he was involved in a construction activity protected under the Act; (2) the activity took place on a structure covered by the Act; (3) a scaffold or similar device defined by the Act was being used; (4) the device was unsafe or not safely placed or located; (5) the unsafe condition proximately caused the plaintiff's injury; (6) the defendant employer had charge of the work; and (7) the employer wilfully violated the Act. *Cockrum v. Kajima International, Inc.* (1993), 243 Ill. App. 3d 402, 410, 610 N.E.2d 1373, 1378.

A verdict should be directed or a judgment *n.o.v.* entered only in those cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) However, a movant may be entitled to a new trial when the evidence favoring the opponent is contrary to the manifest weight of the evidence but not so weak as to entitle the movant to a judgment *n.o.v. Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512-13.

The jury returned a general verdict in favor of defendants. The parties did not request a special verdict and did not submit special interrogatories. When a jury enters a general verdict for a defendant, we do not know on what basis it made its finding. (*Maple*, 151 Ill. 2d at 449, 603 N.E.2d at 510.) Accordingly, the jury's verdict was supportable under *Pedrick* and *Maple* if the jury could have properly found either that defendants did not wilfully violate the Act or that any wilful violation was not a proximate cause of plaintiff's fall and injuries.

The evidence at trial included the testimony of Richard Plimpton, who is the general manager of Modahl, Gene Harvey, the sales representative at F.S., and Michael Owen, owner of defendant Owen Construction.

Plimpton testified that Modahl is a ready-mix concrete manufacturing and delivery business. He described the building in question as follows: (1) it is a "pole" building, with metal siding, a metal roof and a concrete floor and it is used for material storage; (2) it is approximately 50 feet wide by 70 feet long, running from north to south; (3) the metal roof is supported by rafters that run east and west, and "purlins," or 2 by 4 boards, which run north and south and which connect the rafters horizontally; and (4) the purlins are nailed to the rafters, and the metal roof is nailed to the purlins. He stated the building was constructed in the early 1970's, and Modahl acquired it in 1984 or 1985.

Michael Owen, in further describing the building, stated there are 10 Plexiglass skylights in the roof, five on either side of the ridge cap or peak. Each is approximately 3 feet wide by 9 or 10 feet long, and they are spaced at an approximately equal distance apart.

The undisputed evidence was that sometime in August or September 1989, Plimpton hired Harvey to repair a leak in the roof of the building in question. Harvey inspected the roof both inside and out and concluded the repairs would include caulking nail holes, replacing one or two end caps and replacing six cracked sky lights.

Harvey hired Owen to do the repairs on Modahl's roof, and Michael Owen hired plaintiff, his brother Scott Owen, and Chris Harmon to do the actual work.

The evidence was also undisputed that on September 17, 1989, while working on the roof in question, plaintiff fell either through the roof or through a skylight to the floor below. Several witnesses described a hole which plaintiff fell through. Richard Plimpton testified that the hole was approximately 12 inches across, and it was shaped "like a square turned 90 degrees" and deflected downward. He said the part deflected downward was part metal roof and part skylight. He also said he was not sure if any of the skylight was missing. He said, in response to a question as to whether the hole was big enough for plaintiff to go through, "I wouldn't think so," "it would be somewhat difficult," but "nothing is impossible."

Plaintiff argues a part of the metal roof bent down as he went through, then sprang back into place. Defendants argue the skylight was cracked and it was a piece of the skylight which bent down then sprang back into place.

Plaintiff testified (1) he is 6 feet 7 inches tall and weighed approximately 230 to 240 pounds at the time of the accident; (2) he always walked the nail rows, on the purlins, when he was on a roof, because of his weight, so he would not damage the steel or fall through; (3) immediately prior to the accident, he and Scott Owen were caulking around a skylight and ran out of caulk; (4) in getting a new supply of caulk, he walked to the north end of the building along one of the purlins, turned west and walked up the slope of the east side of the roof along a rafter, over the peak of the roof and down the west side to where the caulk was; (5) he then went back to the peak, crossed over and started walking south on the first purlin nearest the peak; (6) as he walked on the purlin, he stepped over two skylights; and (7) when he reached the third skylight, he stepped over it, and, the next thing he remembers, he was on the ground. He said he looked up and saw that the purlin did not continue on the other side of the skylight.

The evidence was undisputed that a purlin on one side of the skylight in the area where plaintiff fell was not aligned with the one on the other side of the skylight. Plaintiff maintains that he followed the nail marks in the roof indicating the existence of a purlin underneath when he walked on the roof and that he stepped across the skylight anticipating that a purlin would be underneath the other side of the skylight. Plaintiff's theory of the case is that the lack of alignment of the purlins was the basis of the alleged wilful violations of the Act.

Gene Harvey testified that he looked up at the skylight after plaintiff's accident and saw a hole. He said he did not see any steel ripped or bent down. He said the hole "looked like [it was] large enough to drop a small child through." He stated the hole was between two purlins.

Michael Owen testified the hole was "approximately a foot, 17, 18 inches in diameter," and the steel was not torn or bent. He said he did not see any steel dangling, but the skylight appeared to be "ripped" and "dangling down." He also stated the hole did not appear to be large enough for plaintiff to have fallen through, but "the tear was in the skylight, I believe—well, apparently, he did fall through it."

Scott Owen testified that he remembered the hole being 8 to 10 inches wide and did not appear to be large enough for plaintiff to have fit through. He said he did not know how he went through it. He also said the metal was not bent or damaged, but "it may have folded under." Scott Owen stated the hole was on the northeast corner of the skylight, which was contrary to the testimony of other witnesses, who stated the hole was on the south side of the skylight.

Chris Harmon, who was also working on the roof repair, said he was inside the building at the time of the accident, and he saw plaintiff "coming through the skylight." He said all he heard was a "pop." He described the hole as 16 by 12 inches wide, and he said it was not big enough for plaintiff to come through. Harmon testified that the metal next to the hole was bent, but it was not hanging down and did not have to be replaced. He said that plaintiff would not have fallen if the purlin had extended underneath the skylight, but rather, he would have just broken the skylight.

Gene Harvey, Michael Owen and Scott Owen all testified that it was not necessary, for safety, to walk on the purlins, Harvey stated that, when he inspected the roof, he walked back and forth and up and down on the roof several times. He said the steel would support his weight, but he tried to keep off of the "high ridge" of the corrugated steel, because that could bend with his weight, and that would make the roof "look bad." He said stepping on the high ridge would not, however, cause a person to fall through the steel. The reason he knew the steel was safe to walk on was because it was the same steel F.S. sells, and he knows the strength of steel.

Harvey stated that, "in most cases," purlins run the entire length of the building, but "in most cases," the steel cannot be bent if you walk in between purlins. He also stated that one could walk on the "nail lines," where the metal roof was nailed to the purlins, but "you don't have to." It is more important to stay off of the high ridge than

to walk on the nail lines. He concluded that, as far as he was concerned when he was inspecting the roof, it was adequate and sturdy enough to support his weight, and he did not notice any area of the roof that was structurally unsound. He said his inspection from inside the building did not reveal anything out of the ordinary.

Michael Owen also testified that the steel on the roof would support someone of plaintiff's height and weight, of approximately 240 pounds, even if there was no purlin beneath it. He said the steel was "29 gauge," which would have a strength of 80,000 PSI (pounds per square inch). He said, however, he did not think it was safe to step over a sky light, even if walking on a purlin, because if you step on the skylight, "you will go through it." He later agreed that if plaintiff had stepped "right on the purlin" he would not have fallen through the skylight, but if he had been as little as two inches off the purlin, he would have gone through.

Scott Owen testified that it was not necessary for safety to walk on purlins, and that one should "never" walk over skylights. He stated that even with a purlin underneath it was dangerous to step on a skylight, because the skylight could break. He said one could fall through, but it would depend on how the skylight cracked.

In order to prove a wilful violation of the Act, a plaintiff must show that a defendant knew or in the exercise of reasonable care should have known that a dangerous condition existed on a support device. *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 453, 473 N.E.2d 946, 950; *Cockrum*, 243 Ill. App. 3d at 415, 610 N.E.2d at 1381.

Plaintiff maintains that under the evidence (1) he must have stepped across the skylight, placing his weight upon the steel on the other side which was not supported by a purlin; (2) the steel gave way causing him to fall; and (3) the steel then snapped back. He maintains that, if he had merely stepped on the skylight, the hole would have been bigger. This theory would explain why the witnesses had difficulty in understanding how a person of plaintiff's size could have fallen through a hole of the size that remained. Accordingly, plaintiff contends that, as a matter of law (1) the lack of the purlin was a hazard of the structure upon which he worked, (2) that hazard was a proximate cause of his fall, and (3) defendants were in wilful violation of the Act because they knew or should have known of the existence of the hazard.

■ As we have indicated, plaintiff is not entitled to a judgment *n.o.v.* or a new trial if the jury could have properly found that neither defendant committed a wilful violation of the Act, and no such violation would have occurred unless one of the defendants knew or, in the exercise of reasonable care, should have known of the exis-

tence of a dangerous defect. No evidence was presented that either defendant designed or built the roof or had intimate knowledge of its construction. The jury could have believed Harvey's testimony that he examined the under surface of the roof by looking up at it from a distance of approximately 24 feet below and saw no defect in the purlins. Michael Owens testified that no substantial disparity in the distance between the purlins existed. A determination by the jury that neither defendant knew or should have known of a defect in the arrangement of the purlins which created a danger would not have been contrary to the manifest weight of the evidence.

Accordingly, we affirm the judgments entered on the verdicts.

Affirmed.

COOK and LUND, JJ., concur.